**JULIEN J. STUDLEY, INC., Plaintiff-Appellant,**

v.

**GULF OIL CORPORATION, Defendant-Appellee.**

**No. 64, Docket 31226.**

United States Court of Appeals Second Circuit.

Argued Oct. 3, 1967.

Decided Dec. 5, 1967.

Alan E. Bandler, New York City (Kramer, Bandler & Labaton and Sidney Kramer, New York City, on the brief), for plaintiff-appellant.

William M. Kufeld, New York City (Carb, Luria, Glassner & Cook of New York City, on the brief), for defendant-appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is an action by Julien J. Studley, Inc., the plaintiff-appellant, a real estate broker, against Gulf Oil Corporation, the defendant-appellee, to recover the amount of a commission which, except for certain conduct on the part of Gulf, it allegedly had a reasonable expectation and opportunity to receive from Rock-Uris upon the consummation of a lease for office space in the Sperry Rand Building, between Gulf as the tenant and Rock-Uris as the landlord. At the end of the defendant's case the district court directed a verdict in favor of the defendant and entered judgment dismissing the complaint. It is from that judgment that the plaintiff appeals; we reverse and remand for a new trial.

The plaintiff's amended complaint contains three counts. The first of these claims a breach of contract based upon the defendant's employment of the plaintiff as its agent to locate office space in New York City with the understanding that, if the plaintiff procured an acceptable lease for it, "defendant would enter into a lease * * * and * * * plaintiff would be the broker in the transaction," and thereby become eligible for payment of a commission. The plaintiff charges that the defendant breached its agreement by entering into a lease with Rock-Uris for the space found by the plaintiff without designating it as the broker.

The second count alleges malicious interference. The plaintiff asserts that Rock-Uris generally solicited brokers, including the plaintiff, to find tenants for the Sperry Rand Building for which, if successful, the broker would be paid a commission. The plaintiff complains that Gulf maliciously interfered with its reasonable expectancy and opportunity to get the commission by representing "that plaintiff was not the broker and rendered no services in the transaction." The third count alleges a "conspiracy with others to deprive plaintiff of the commission it had earned."

Because this appeal comes to us as a result of the district judge's ruling that the plaintiff presented insufficient evidence to warrant submitting the case to the jury, it is necessary to refer to the evidence in some detail and, viewing it in the light most favorable to the plaintiff-appellant, to state the facts which the jury might reasonably find from it. In determining whether, as a matter of

law, there is not sufficient evidence to warrant submitting a case to the jury, the trial judge must apply the measure usually stated in these terms: "Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury." Baker v. Texas & Pacific Railway Co., 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959); Diapulse Corporation of America v. Birtcher Corp., 362 F.2d 736, 743 (2 Cir. 1966).

At the time of the negotiations in dispute Walter Burkhiser was manager of the Building Services Department in Gulf's Pittsburgh office and, as Secretary, sole member of Gulf's Executive Committee for Office Standards. In 1960 Julien Studley, president of plaintiff corporation, wrote to Gulf, soliciting its interest in available office space in New York City. The president of Gulf referred the letter to Burkhiser for a reply but no action was taken at that time. Two years later, in 1962, the Executive of Gulf (composed of the chairman of the board, the president, and four executive vice presidents) requested Burkhiser to review Gulf's New York City office space situation, which then consisted of three suites of offices in widely separated locations. In compliance with that request Burkhiser made a study and submitted a report on the existing arrangements in a memorandum dated September 5, 1962. Shortly thereafter, he was sent to New York to investigate the availability of office space in the Rockefeller Center area with a view towards consolidation of the offices. Before leaving, he called Studley and told him that he wanted to talk to him about the problem Gulf was having with office space in New York but that the matter was confidential and should not even be disclosed to Gulf's representatives or employees in New York. Burkhiser requested Studley to prepare a report and made an appointment to see him in New

York. They met there on September 25th and Studley gave Burkhiser the report describing fifteen different buildings in New York City, any one of which might meet Gulf's office space requirements.

Studley testified that when he met with Burkhiser he said to him that "we were very pleased to have been called by Gulf and to be the broker in this situation, if it were to develop * *" After discussing the alternatives open to Gulf, Burkhiser and Studley inspected the Pan American Building and the Sperry Rand Building, which were among those described in the report. While walking from the former to the latter, Studley asked Burkhiser "whether there was a chance of moving Gulf altogether from Pittsburgh, and * * * [Burkhiser replied] 'You should be satisfied with the commission you will make on this, if we make a deal. Don't look for a bigger deal.'" After they arrived at the Sperry Rand Building, Burkhiser told Studley that "he wanted to make sure that he had all the information on both of these buildings" and Studley delivered additional material the next day.[1] After Burkhiser had returned to Pittsburgh, Studley called him from New York, at which time Burkhiser told Studley that he had received all the information he needed, that he was preparing a report, and that Studley should "keep in touch and to let him know of any changes or developments in connection with any of the buildings, particularly in connection with Sperry Rand * * *."

In his memorandum to the executive vice president dated September 28 and marked "Private and Confidential," Burkhiser summarized Gulf's existing office arrangements in New York City and suggested that the "best possibility" for consolidation was in the Sperry Rand Building. Burkhiser testified that Studley was the source of "rental rate information" contained in that memorandum.

1. Burkhiser requested "maps of the areas, of any other developments in the areas, * * * and also * * * a map of the area showing the location of the oil companies with whom Gulf did business."

The additional material delivered to Burkhiser included a brochure on the Pan American Building, a brochure on the Sperry Rand Building, and three maps.

In letters to Burkhiser dated October 1, 9, and 30, Studley informed Burkhiser of developments in connection with the Sperry Rand Building. Studley also testified to telephone conversations between Burkhiser and himself, including a call from Burkhiser to him asking him to check on the date when Gulf could take possession.

Denys Cadman, executive representative of Gulf in New York City, had his office in Canada House and he wanted it to remain there. When he learned on or about October 22, 1962, that Gulf would not continue to lease offices in Canada House, he contacted Jacques Juncker, a real estate broker associated with the firm of Cushman & Wakefield, Inc., which was in charge of Canada House. Juncker then prepared a letter, dated October 22, to Cadman, as the representative of Gulf, presenting various buildings for the consideration of Gulf, including the Sperry Rand Building. On the same day, Cadman called Juncker and told him that Gulf was interested in the Sperry Rand Building. Cadman's office also notified Burkhiser that "all future negotiations regarding the Sperry Rand Building were to be conducted with Cushman & Wakefield." Burkhiser acknowledged receipt of this message in a memorandum to Cadman stating that Studley, Inc. was the broker which had first proposed the Sperry Rand Building and had rendered services in that regard, and that "Mr. Studley's firm would no doubt be entitled to some consideration." Also on October 22, Juncker wrote to Rock-Uris, claiming authorization by Gulf to offer, on its behalf, to lease one floor in the Sperry Rand Building.

On October 30th, Burkhiser met with Bernard Friedman, then Vice President and Director of Rock-Uris and in charge of the renting of the Sperry Rand Building, and with Cadman and Juncker. During the course of the day, Burkhiser, Cadman and Juncker discussed the nature of the services provided by Studley, Inc. and the fact that Studley, Inc. would expect a commission on the consummation of the transaction. Juncker told Burkhiser that he had first shown Cadman the Sperry Rand Building but subsequently gave Rock-Uris a letter of indemnification against any claim by Studley, Inc. for a brokerage commission.

On November 2, Friedman wrote Juncker, attaching an outline of the terms of the proposed lease which had been discussed on October 30th. The terms were essentially accepted by Gulf on November 6th [2] and were eventually incorporated in the lease between Gulf and Rock-Uris. Friedman did not learn of any services on the part of Studley, Inc. until November 7th.

On that day Burkhiser telephoned Studley and informed him that although Gulf was going into the Sperry Rand Building, it was doing it through another broker and that Gulf would appreciate it if his firm would withdraw as broker. Studley returned the call later that day and said that his firm would not withdraw. In a letter written to Burkhiser dated November 7, Studley indicated that he had spoken to Friedman and the latter gave him "every assurance that if my position is clearly established by Gulf, our company shall be recognized for its role in this transaction. And, in the event a lease is concluded, that commissions will be paid us."

Cadman had introduced Juncker to Friedman as Gulf's broker at the meeting on October 30th. He was thereafter so regarded and ultimately received the commission. Cadman testified that he had never discussed the services rendered by Studley, Inc. with Friedman, and Friedman testified to the same effect. But Cadman told Burkhiser that he had discussed the entire situation with Friedman and that Friedman did not want to

---

2. In an inter-office memorandum dated November 6, 1962, Friedman indicated that he had received "a confirmation this morning from Jacques Juncker on behalf of Mr. Whiteford, Chairman of the Board of Gulf, as to their leasing the 34th through 36th floors, in accordance with the aforementioned Outline" of Terms. The lease was not actually signed by Gulf until December 17, 1962.

discuss it with Burkhiser at all. The jury could well find that Burkhiser would have apprised Friedman of the services rendered by Studley, Inc. in the transaction, had it not been for the intentional falsehood on the part of Cadman.

■■ To get its case on the first or contract count to the jury for determination, the plaintiff had to offer sufficient evidence to support findings that Burkhiser had the authority to employ the plaintiff for the purpose of locating suitable and adequate office space for Gulf, that there was a promise on Gulf's part, if a lease agreement for such office space were consummated, that the plaintiff would be designated by Gulf to the lessor Rock-Uris as the broker in the transaction, and that, although the plaintiff brought about the lease of the space in the Sperry Rand Building, Gulf repudiated its promise to designate the plaintiff as the broker. See James v. Home of the Sons and Daughters of Israel, 153 N.Y.S. 169 (Sup.Ct.1915); Pease & Elliman, Inc. v. Gladwin Realty Co., Inc., et al., 216 App.Div. 421, 215 N.Y.S. 346 (1st Dept. 1926). We conclude that the plaintiff put in sufficient evidence for this purpose and that the court should not have directed a verdict for the defendant.

■ The trial court's conclusion that Burkhiser, as a matter of law, lacked the authority to deal with the plaintiff, was an error. It held that "there was an overwhelming hush, equivalent to complete silence, of an express agency" and, "[a]s to apparent agency, the cases are overwhelming that the claim cannot survive if it is dependent solely on the proof from the agent; and that is the case here." But Burkhiser was sent by the highest officials of Gulf in 1962 to investigate the availability of office space in the Rockefeller Center area for Gulf's occupancy in locating all of its New York operations in one set of offices. There was no evidence even suggesting that he was to do this otherwise than by the usual and customary way of consulting with a reputable and experienced broker or that

Burkhiser had exceeded his authority by consulting Studley. "The general rule followed in New York is that 'an agent employed to do an act is deemed authorized to do it in the manner in which the business intrusted to him is usually done.'" Masuda v. Kawasaki Dockyard Company, 328 F.2d 662, 664–665 (2 Cir. 1964). The jury could infer from Gulf's behavior throughout the lease negotiations that it intended to act through a New York broker. In fact the present controversy arose because Gulf dealt with too many brokers.

There was ample evidence from which the jury could find that Burkhiser had implied authority to make the arrangement with Studley, Inc. through which Gulf availed itself of the firm's services, Lind v. Schenley Industries Inc., 278 F. 2d 79, 84 (3 Cir. 1960); Wen Kroy Realty Co. v. Public National Bank & Trust Co. of New York, 260 N.Y. 84, 89, 183 N.E. 73, 74 (1932); Restatement (Second), Agency § 7, comment c (1958); and from Studley, Inc.'s viewpoint that Burkhiser had apparent authority to engage its services and to agree to inform Rock-Uris that Studley, Inc. was the broker which brought about Gulf's lease of office space in the Sperry Rand Building. Lind v. Schenley Industries Inc., supra, 278 F.2d at 85; Restatement (Second), Agency § 8 (1958). The district court's holding that there was no apparent agency rested upon its assertion that an apparent agency cannot be established "solely on the proof from the agent." While it is true that neither the existence nor the scope of an agency can be proved by the admissions, representations or acts of the agent, unless such statements and acts are shown to have been with the knowledge and acquiescence of the principal, the agent may testify on the witness stand to the fact of the agency and its extent. As the Restatement (Second), Agency § 285, comment a (1958), says: "A person can properly testify as to the facts which it is alleged constitute his authority, and his testimony can be introduced * * against the alleged principal." See Mechem, Outline of the Law of Agency, §

95 (4th ed. 1952); IV Wigmore, § 1078, pp. 123–125 (3rd ed. 1940).

The jury could also have found that Studley, Inc. should not have been expected to notify Rock-Uris of the part it played in Gulf's acquisition of space in the Sperry Rand Building because Burkhiser, on behalf of Gulf, had enjoined Studley to keep the matter in confidence, and that in compliance with its agreement and in the exercise of good faith, Gulf should have told Rock-Uris of Studley's role in the transaction and that Gulf not only failed to do so, but through Cadman's false representations prevented Rock-Uris from learning about it, and that the contract was breached.

■ It was contemplated by Studley, Inc. and Gulf that once Gulf had told Rock-Uris that Studley, Inc. was the broker which had brought about the lease, it would then be up to Rock-Uris to pay any commission due to Studley, Inc. Although by its terms, the understanding therefore imposed only the obligation of good faith upon Gulf rather than a financial commitment, nevertheless, once the obligation was breached, Gulf became liable for damages, measured by the compensation the broker would have earned if Gulf had fulfilled its obligation. Westhill Exports Limited v. Pope, 12 N.Y.2d 491, 240 N.Y.S.2d 961, 191 N.E.2d 447 (1963); Parker v. Simon, 231 N.Y. 503, 508, 132 N.E. 404, 405 (1921).

The trial court disposed of the second count, alleging malicious interference, by holding that Studley's failure to prove "a valid contract with Sperry Rand * * * defendant's knowledge of the contract * * * [and] intent to cause the contract to be broken" made the claim an empty one because no advantageous business relationship existed between Studley and Rock-Uris with which Gulf could have interfered.

■ It disposed of the third or conspiracy count by concluding that the proof was "so scant as to barely make its presence known and far from sufficient to warrant submitting it to a jury."

This count calls for no separate discussion because it must be treated simply as an allegation of a tortious interference by Gulf with Studley's business opportunity through Gulf's false representation of Studley's position as broker. The allegation of conspiracy against Gulf states no new or additional cause of action. Miller v. Spitzer, et al., 224 App. Div. 39, 229 N.Y.S. 526 (1st Div. 1928); Smith v. Helbraun, 38 Misc.2d 136, 238 N.Y.S.2d 212 (1963).

On this appeal Gulf argues that there was no evidence that Burkhiser had any authority to retain the services of Studley, Inc.; that there was no evidence that Rock-Uris employed Studley, Inc. or promised it a commission if it procured a tenant; and that Studley, Inc. could not have had a business opportunity interfered with and at the same time claim it had a right to a commission from Rock-Uris; and, to the extent that Studley, Inc. may have been connected with the acquisition of office space by Gulf, it was not at a time when negotiations between Rock-Uris and Gulf had reached a stage where it could be found that Studley, Inc. had acquired a business opportunity. We have already concluded that there was sufficient evidence to warrant the jury's finding that Burkhiser did have the necessary authority. Gulf lays a great deal of stress upon the absence of an agreement express or implied between Rock-Uris and Studley, Inc. Studley's claim, however, does not rest upon the breach of an agreement between itself and the landlord; rather it charges a breach by Gulf in not only not fulfilling its agreement to advise Rock-Uris that Studley, Inc. was the broker in the transaction, but in actively preventing the disclosure of that information. Gulf asserts that Rock-Uris actually received the information from a number of sources before the lease was formally executed in late December, 1962, but there was evidence from which the jury could find that all of the terms of the lease had been agreed upon between Rock-Uris and Gulf before November 7th, 1962, the first date on which Rock-Uris was informed

that Studley, Inc. had anything to do with the matter.

■ The trial court erred in failing to consider the evidence presented by the plaintiff-appellant in support of its tort claim in the second and third counts in the light of New York law. Under the substantive law of New York, "a real estate broker is entitled to a commission if he is the procuring cause of the sale, that is, if he brings seller and buyer together and a sale consequently results * * * The right to collect the commission is not lost because the broker does not participate in the negotiations * * * or because the final terms of sale are not identical with those originally presented to the broker * * *." Risser v. Hirshhorn, 199 F.2d 917, 919 (2 Cir. 1952). See Wattley v. Commissioner of Internal Revenue, 275 F.2d 461 (2 Cir.), cert. denied, 364 U.S. 864, 81 S.Ct. 107, 5 L.Ed.2d 86 (1960). In Katz v. Thompson, 19 Misc.2d 848, 189 N.Y.S. 2d 982, 985, aff'd, 9 A.D.2d 951, 196 N.Y.S.2d 578 (1959), a real estate broker brought an action to recover a commission for the sale of realty against the vendor, and to recover damages for tortious interference against the purchasers of the realty. In affirming the denial of the purchasers' motion to dismiss the complaint, the county court stated:

"The doctrine first announced in Lumley v. Gye * * * that interference with an executed contract of employment would result in tort liability has been extended to interference with contractual relations which would have been entered into save for the actions of the third party * * * or with economic advantage reasonably to be expected * * *."

See also 1 Harper & James, Law of Torts 510 (1956). The jury would be justified in finding that Studley, Inc. reasonably expected an economic advantage to flow from persuading Gulf of the suitability of the Sperry Rand Building and to lease office space in it, and, further, that Gulf, through Burkhiser's request for confidentiality, prevented Studley, Inc. from apprising Rock-Uris of the true facts. It could also find that Cadman failed to disclose to Rock-Uris the part Studley had played in promoting the lease, even after he knew about it, and instead, affirmatively represented to Rock-Uris that Juncker of Cushman & Wakefield Inc. was the only broker in the case, and that Cadman intentionally made a false representation to Burkhiser to prevent Burkhiser from disclosing to Rock-Uris Studley, Inc.'s part in bringing about the lease. The jury could also conclude that as the result of Gulf's successful effort to keep Rock-Uris in ignorance of Studley, Inc.'s position as broker, Studley, Inc. failed to realize an economic advantage.

In Risser v. Hirshhorn, supra, the plaintiff real estate broker sued both Hirshhorn, the seller, and Kress, the purchaser, to recover a brokerage commission. After the purchaser had inspected the property and discussed the seller's terms, the seller and purchaser met at the property and continued negotiations with each other without the broker being present. They ultimately agreed upon a sales contract which included the statement that "there are no brokers involved in this sale." There was evidence that a representative of the seller knew that the broker had procured this particular purchaser but the broker had never so advised the seller. Because of this the trial court had directed a verdict for the defendant. On appeal this court held that the question of whether under the circumstances the seller had exercised reasonable care to ascertain whether or not the plaintiff-broker had been the procuring cause of the sale was one for the jury. It also held that if the jury found that the seller, Hirshhorn, was entitled to rely, without further inquiry, on the purchaser Kress' representation that there was no broker involved, then it was for the jury to determine whether, assuming the plaintiff qualified for a commission, she lost it because of the purchaser Kress' misrepresentation and that therefore the purchaser would be liable to the plaintiff.

In Cohen v. City Bank Farmers Trust Co., 276 App.Div. 195, 93 N.Y.S.2d 609

(1st Dept. 1949), a real estate broker brought an action to recover a commission upon the sale of hotel property. The trial court dismissed the complaint at the close of the plaintiff's evidence on the ground that the plaintiff-broker's failure to inform the seller of the identity of Moses, his prospective purchaser, prior to the signing of the contract of sale, was fatal to the plaintiff's action against the seller. There was evidence to show that after the plaintiff had discussed with Moses the details of the purchase of the hotel property over a considerable interval of time, Moses appeared no longer interested as a purchaser and broke off negotiations. Thereafter, however, Moses associated himself with one Clark, another broker, and purchased the property, certifying at the time that no broker, other than Clark, had participated in any dealings concerning the property. On appeal the Appellate Division held that a prima facie case was made out against the purchaser Moses "on the theory of fact that the transaction would have been closed through plaintiff's agency * * * except for bad faith on Moses' part, in endeavoring to defeat plaintiff's commission, in ostensibly breaking the negotiations off * *." 276 App.Div. 195, 199, 93 N.Y.S.2d 609, 612. The court continued by saying:

> "The certification by Moses that no broker other than Clark had participated in any dealings in connection with this transaction was made to Prudence [seller's representative] but the triers of the fact could find that it was false, and intentionally so, and evidenced a willingness to deceive on Moses' part. Since such a state of mind is relevant where a defendant is charged with bad faith, a jury could have found that this evinced a deliberate purpose on Moses' part * * * to misrepresent plaintiff's part in the transaction, to prevent plaintiff from earning a commission." Ibid.

The case of Goodman v. Kirkeby, 282 App.Div. 86, 121 N.Y.S.2d 158, leave to appeal denied, 306 N.Y. 981, 116 N.E.2d 247 (1953), in which a directed verdict

for the buyer was upheld, which is cited by Gulf, is distinguishable from *Risser* and *Cohen* because, although in that case the buyer made a misrepresentation that no broker was involved in the sale, the seller who employed the plaintiff broker knew throughout the course of the dealings that the plaintiff had brought about the sale and could not, therefore, have been deceived by the buyer's false statement.

In the present case the jury could find that Rock-Uris reasonably relied upon Gulf's misrepresentations to deny Studley, Inc. the commission. Studley, Inc.'s two letters, stating its claim, sent to Rock-Uris after the terms of the lease had been agreed upon, would carry little persuasive force in the face of Gulf's refusal to substantiate Studley, Inc.'s claim and its representation that Juncker, with whom Rock-Uris dealt in the closing of the transaction, was the procuring cause of the lease.

The District Court was in error in refusing to submit these factual issues to the jury and the case is therefore reversed and remanded for a new trial.