**JULIEN J. STUDLEY, INC., Plaintiff-Appellant,**

v.

**GULF OIL CORPORATION, Defendant-Appellee.**

No. 213, Docket 32369.

United States Court of Appeals Second Circuit.

Submitted Dec. 4, 1968.

Decided Feb. 13, 1969.

522

Bandler, Goldstein, Kagan & Klarsfeld, New York City (Alan E. Bandler, Neal M. Goldman, Bernard L. Goldstein, Costa L. Papson, New York City, of counsel), for plaintiff-appellant.

Carb, Luria, Glassner, Cook & Kufeld, New York City (William M. Kufeld, New York City, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and FRANKEL, District Judge.*

FRANKEL, District Judge:

Julien J. Studley, Inc., the plaintiff-appellant, a real estate broker, brought this diversity suit to recover from Gulf Oil Corporation, defendant-appellee, the amount of a commission plaintiff claims it would have earned upon Gulf's leasing of office space in 1962 but for a breach of contract and other wrongs allegedly perpetrated by the latter in connection with that transaction. This is plaintiff's second appeal from a dismissal of its claims by a second trial judge for what was found on both occasions to be a want of evidence. The first appeal, following direction of a verdict at the close of defendant's case, resulted in a reversal and remand for a new trial, 2 Cir., 386 F.2d 161 (1967). This time, having been allowed to go to the jury, and having recovered a verdict of $25,000, plaintiff confronts another adverse judgment after the granting of defendant's motion under Fed.R.Civ.P. 50(b) to set the verdict aside. Concluding that the verdict was a permissible one, we reverse.

### I.

The amended complaint contains three counts. The first charges a breach of contract, alleging that Gulf employed plaintiff to find suitable office space; agreed that it would designate plaintiff as the broker on any lease resulting from plaintiff's efforts; used plaintiff's services as thus agreed upon, obtaining as a result 60,000 square feet of satisfactory office space at 1290 Avenue of the Americas (the Sperry Rand Building), and executing a lease with the owner of those premises; but, despite plaintiff's performance of all the terms and conditions of the agreement, failed to designate plaintiff as broker. The second count charges interference "with the precontractual relationship" among plaintiff, Rock-Uris, Inc., owner of the Sperry Rand Building, and Cushman & Wakefield, Inc., renting agent of that building, in that Gulf denied to the other two companies that plaintiff had performed services as broker. The third count substantially repeats the second, but asserts a conspiracy among Gulf and the other two companies to accomplish the same wrong. As will be seen, only the first count interests us now.

From the evidence in the second trial as from the substantially similar record of the first, the jury could have found the following facts, among others:[1]

Gulf's top management, headquartered in Pittsburgh, was its six-member Executive, made up of the board chairman, president, and four executive vice presidents. In 1962 the Executive assigned Walter P. Burkhiser, then director of the Company's General Services Department and sole member of its Executive Committee for Office Standards, to survey and report upon its New York office space. Gulf at the time had three sets of New York offices, located in three widely separated buildings, with leases expiring at varying dates from 1963 to 1969.

Burkhiser analyzed the situation in a memorandum for the Executive dated September 5, 1962. Later that month, he was directed to explore the availability of space in the Rockefeller Center area with a view to possible consolidation of the offices in a single location. He called Julien Studley, plaintiff's

---

* For the Southern District of New York, sitting by designation.

1. Gulf devotes several pages of its brief to an attempted demonstration that the present record is significantly weaker for the plaintiff than was the prior one although the only grossly noticeable difference is the calling of an additional witness for Gulf in the second performance. We mention this item of Gulf's position only briefly, and only to note its rejection in all essential respects.

president, and arranged to meet with him, urging that Studley keep the matter in confidence. On September 25, Burkhiser came to New York and consulted with various Gulf officials stationed there. On the following day, he met with Studley.

Studley, who had previously supplied Burkhiser with extensive information about buildings in the Rockefeller Center area, now went with Burkhiser to inspect the Pan Am and Sperry Rand buildings, both of which were then under construction. Burkhiser requested, and Studley supplied the next day, additional material on these two buildings. In the course of the discussions, Studley asked about the possibility that Gulf might move all of its office staff, including the Pittsburgh headquarters, into New York City. Burkhiser cautioned against such large projections, telling Studley he would have to be satisfied with the more limited deal they were exploring together. Earlier, Studley had voiced his appreciation over being called upon as prospective broker for the project immediately at hand. Burkhiser expressed no different understanding, either then or at any material time thereafter.

■ Without detailing the evidence any further, we conclude now, as we did on the prior appeal (see 386 F.2d at 165–66), that the jury had evidence ample to support a finding that Burkhiser had actual, or at least apparent, authority to enlist plaintiff's assistance and to promise a designation of plaintiff as broker in any resulting lease transaction. But, authorized or not, no such arrangement was ever consummated.

Gulf's executive representative in New York City, A. Denys Cadman, had his office in Canada House, a building managed by the real estate firm of Cushman & Wakefield, Inc. Cadman hoped to stay where he was, and pressed steadily for a decision by his superiors that would permit this. On October 22, 1962, however, at a meeting in Boca Raton, Florida, Cadman was told that the Executive had determined to consolidate the offices in the Sperry Rand Building. Knowing of Burkhiser's responsibilities in this area, he instructed his secretary to call Burkhiser in Pittsburgh and inform him that "Gulf's future interests, if any, in the Sperry Rand Building, would be conducted by Mr. Cadman with Cushman & Wakefield." Burkhiser, who had continued to keep in touch with Studley, particularly to be kept informed of current developments and expected completion times for the Sperry Rand Building, responded in a memorandum which reported his Studley contacts and observed (as he testified in the absence of the unproduced memorandum) "that there might possibly be room for some consideration for Mr. Studley."

On October 30, Gulf (represented by Cadman, Burkhiser, and an architect from Burkhiser's staff) met for the first time with the owner of the Sperry Rand Building, Rock-Uris, Inc. (represented by Bernard H. Friedman). Jacques Juncker, of Cushman & Wakefield, came to the meeting as prospective broker. After Friedman's departure, the others discussed Studley, Burkhiser repeating his thought that the latter might have grounds for a claim. Juncker and Cadman asserted that Cushman & Wakefield had "exposed" Gulf to the Sperry Rand Building before Studley's arrival on the scene. Juncker agreed, however, that Gulf would be indemnified against possible claims by plaintiff—a promise ultimately implemented by agreements for indemnity (1) from Cushman & Wakefield to Rock-Uris and (2) from Rock-Uris to Gulf.

The basic terms of the lease from Rock-Uris to Gulf were agreed upon at the October 30 meeting and in effect accepted by Gulf on November 6. On November 7, Burkhiser called Studley, described the situation to him, and asked Studley to "step out," promising that Gulf would show its gratitude for such an accommodation at some future time. Studley asked for time to think a bit,

then called back to report his unwillingness simply to bow out empty-handed. Rather, Studley urged, Gulf should merely place the facts of plaintiff's role before the owner, in which event he (Studley) would be willing to abide the owner's decision. Burkhiser agreed to this, and reported the posture to Cadman on the following day. Cadman, in what could well have been found by the jury to be a falsehood, said he had already given the facts to Friedman and that Friedman did not wish to discuss the matter with Burkhiser. (Friedman, at the trial, denied this.) Burkhiser, in a November 8 letter to Cadman, expressed his personal displeasure over finding himself "in the middle"; mentioned his difficulty in understanding why Friedman should want to avoid hearing the facts fully; and announced his distress that for the first time in his career with Gulf, there should be an occasion for anyone to doubt his "personal integrity."

Subject to the indemnity arrangements mentioned above, Cushman & Wakefield was ultimately named as broker in Gulf's lease of three floors in the Sperry Rand Building. At the time of trial, the brokerage commissions from this arrangement amounted to just under $50,000.

## II.

As we have mentioned, the plaintiff in this second trial was permitted to go to the jury. The question we ultimately find decisive of the present appeal centers upon the interrogatories the jury was required to answer in addition to rendering a general verdict. Some aspects of the charge are also pertinent.

The jury was given six interrogatories —three to cover plaintiff's first count, the fourth covering Count II, the fifth covering Count III, and the final one to elicit the general verdict. The questions, together with the jury's answers were as follows:

1. "Did Gulf authorize Burkhiser to enter into an agreement with Studley binding it to represent to Rock-Uris that Studley was responsible for the lease to Gulf in the Sperry Rand Building?"

   Answer: "No."

2. "Did Gulf ratify with knowledge thereof any arrangements made by Burkhiser with Studley pertaining to the lease to Gulf in the Sperry Rand Building?"

   Answer: "Yes."

3. "Did Gulf breach any agreement with Studley made with Gulf's authority or ratified by it with knowledge thereof?"

   Answer: "Yes."

4. "Did Gulf maliciously interfere with any relationship between Studley and Rock-Uris to deprive Studley of compensation from Rock-Uris on the Gulf lease?"

   Answer: "No."

5. "Was Gulf a party to an unlawful conspiracy which damaged the plaintiff?"

   Answer: "No."

6. "To what award, if any, is plaintiff entitled from Gulf?"

   Answer: "$25,000." [2]

In his charge to the jury, Judge Pollack pointed out that the plaintiff, in order to recover on its first (contract) theory, was required to show either actual or apparent authority in Burkhiser, on the one hand, or ratification by Gulf of Burkhiser's unauthorized agreement, on the other. Further, the jury was instructed, plaintiff was required to show an agreement to use plaintiff in the

---

2. The foreman, in reporting the verdict, took pains to see that there should be no possibility of doubt. He requested, and was permitted, to add:
   "Your Honor, charge one, jury finds in favor of plaintiff.

   "Charge two, jury finds in favor of the defendant.

   "Charge three, the jury finds in favor of the defendant."

procurement of the space, plaintiff's performance in that capacity, and a promise by Gulf to "advise the owner that the plaintiff was the broker and give the plaintiff an opportunity to seek commissions from the owner on the basis of the statement of services rendered by the broker at the instance of Gulf."

As to the amount of damages, the jury was instructed this might or might not amount to the full "commission" applicable to the transaction. Pointing out that Studley did not claim "an exclusive right to deal for Gulf," Judge Pollack charged that

> "in the absence thereof even if a broker had a reasonable expectancy of recognition for a compensation a landlord might wish to give but was not obligated to give the commission payable to more than one broker on a transaction by dividing it in some means or by requiring the brokers to get together. If you find that Studley was entitled to compensation from Rock-Uris which Gulf's acts deprived it of, you must nonetheless consider whether Rock-Uris would have compensated Studley by paying part or all of a commission to it and by paying an override to Cushman & Wakefield, if they paid Studley all, or by arranging for a mutual participation between cooperating brokers on the same lease."

The jury, it will be recalled, awarded plaintiff $25,000, or almost exactly half of the commissions actually paid by Rock-Uris to Cushman & Wakefield.[3]

In his detailed opinion granting the motion to set aside the verdict and awarding judgment to the defendant, Judge Pollack reasoned as follows:

(1) The jury's negative answer to the first interrogatory amounted to a finding that Burkhiser lacked authority, actual or apparent, to make an agreement on behalf of Gulf.

(2) The affirmative answer to the second question was a finding of ratification.

(3) The affirmative answer to the third question—finding breach of an "agreement with Studley made with Gulf's authority or ratified by it"—must be read with the second, and must refer only to a "ratified" agreement, not one made "with Gulf's authority."

(4) The record contains "no evidence whatsoever" to support a finding of ratification, and since such a finding was stated by the jury as an essential basis for its verdict, the verdict must fall.

■ Our study of the record leads us to agree with Judge Pollack that the finding of ratification could not stand. For reasons which follow, however, we think it is possible on another basis to reconcile the answers to the special questions with the general verdict, and that this alternative requires reinstatement of the jury's award.

### III.

■ Settled principles require that we harmonize the jury's several pronouncements if possible rather than use the answers to special questions as weapons for destroying the general verdict. Fed.R.Civ.P. 49(b) embodies old and sound learning when it provides that when the answers to specific questions are truly "inconsistent with the general verdict, judgment may be entered * * * in accordance with the answers, notwithstanding the general verdict * * *." See 5 Moore, Federal Practice 2210–11 (2d ed. 1968). But with the Seventh Amendment as an august guide and limitation, we must struggle

---

3. The instructions on divided commissions and the verdict, evidently making a division, seemed directly responsive to the testimony of Bernard Friedman, the Rock-Uris vice president in charge of renting the Sperry Rand Building. Contradicting Denys Cadman, Friedman said he had told Studley he "would be very pleased to talk to him if Gulf instructed [Friedman] to talk to him." It was "very common," he said, to have "brokerage conflicts," and in such cases, if he "felt there was a legitimate conflict, [he] would get the two brokers together and try and get them to split the commission in some way."

to avoid the finding of inconsistency and "attempt to reconcile \* \* \* by exegesis if necessary," the specific responses and the jury's overall judgment as to who should win and who should lose. Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); Arnold v. Panhandle & S. F. R. Co., 353 U.S. 360, 77 S.Ct. 840, 1 L.Ed.2d 889 (1957); Morris v. Pennsylvania R. Co., 187 F.2d 837, 840 (2d Cir. 1951). The record may reveal a plausible, or even highly probable, ground for reasoning that the jury's findings on specific issues leave no logical basis for the general verdict. Even so, if it is discoverable that the jury "might" nevertheless have found consistent grounds for its ultimate decision—if the findings, therefore, "are not necessarily in conflict," Safeway Stores, Inc. v. Dial, 311 F. 2d 595, 600 (5th Cir. 1963)—the general verdict must be sustained. See, e. g., Gallick v. Baltimore & Ohio R. Co., *supra* at 120–22, 83 S.Ct. 659; United Air Lines, Inc. v. Wiener, 335 F.2d 379, 407–409 (9th Cir.), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

> "\* \* \* Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment."

A. & G. Stevedores v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962).

■ While ours is not a case, strictly speaking, of "inconsistency" among the jury's findings, the foregoing principles are pertinent here. Unless the jury's reasoning must inexorably be reconstructed so that a hollow finding of ratification is an indispensable link—unless, in other words, there is no "possible view of the case" on which valid findings support the general verdict—we must uphold the jury's final decision to avoid a potential "collision with the Seventh Amendment."

■ Starting from such premises, we find a reasonably manageable route to preservation of the jury's verdict for the plaintiff. Returning to the interrogatories, we note that the central source of difficulty springs from the shifts in language from the first to the second to the third interrogatories, resulting in ambiguities in the jury's answers. The central flaw in defendant's position is the premise that without having sought the clarification available under Fed.R.Civ.P. 49(b) [4]—and, indeed, with no timely suggestion that either the special questions, or the answers, or both together posed uncertainties of any kind—the party defeated under the general verdict should have the doubts resolved in its favor and the defeat thereby declared a victory.[5]

---

4. "\* \* \* When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial."

5. There is no essential basis for quarreling with the observation in Chief Judge Lumbard's dissent that plaintiff "elected to have the case go to the jury with the five interrogatories that Judge Pollack posed." But the defendant "elected" the same course. And it is defendant, not plaintiff, which insists that the jury must be held to have stultified itself and its general verdict in its answers to the interrogatories. If the idea of an "election" has a role in the case, it should presumably be to discomfit the party which seeks to overturn the result of the course it accepted. But we believe, in the end, that the concept is not vitally useful either way. The heart of the matter is our conclusion that the jury's ultimate verdict for plaintiff should not be erased as a *non sequitur* merely because it is possible, or even easy—but not necessary—to make a syllogism with such a conclusion.

The first question asked whether (a) Burkhiser had been authorized (b) "to enter into an agreement with Studley" (c) binding Gulf "to represent to Rock-Uris that Studley was responsible for the lease in the Sperry Rand Building." The pregnancy of the jury's negative answer is obvious. It could denote lack of authority. It could denote that though there was authority, and though there was an agreement, it was an agreement different from the detailed one defined in what we have isolated as part "(c)" of the question. In this last segment of the question, the word "responsible" is a springboard for relevant, but unanswerable, speculation. Did the word mean— did the jury think it meant—*solely* "responsible" ? Did it mean "responsible" in some "but for" sense—i. e., that without Studley, Gulf would not have come to locate in the Sperry Rand Building? Either construction could have led the jury to its negative answer even though it found that Burkhiser had authority to make *some* agreement. Specifically, this may have been so if the jury, responding to an alternative presented by the instructions, determined that plaintiff was only partly, and perhaps not indispensably, responsible for the transaction. Such partial responsibility, and corresponding credit therefor, would appear to have been the rational premise for the jury's award of $25,000, almost exactly half the total commission, to plaintiff.[6] Such a result would have squared, moreover, with Julien Studley's insistence—and Burkhiser's apparent agreement—that Gulf's minimal obligation was to lay the facts of plaintiff's role before Rock-Uris, the owner, and not necessarily to "represent to Rock-Uris that Studley was responsible for the lease in the Sperry Rand Building."

Once it becomes apparent that the jury could have found an authorized (not merely ratified) agreement despite its negative answer to the first question, no basis remains for depriving plaintiff of its verdict. To be sure, the second interrogatory was addressed exclusively to the subject of "ratification." And the jury answered affirmatively this inquiry as to whether Gulf had ratified "any arrangements made by Burkhiser with Studley pertaining to the lease * * *." But that finding, right or wrong, did not exclude the finding of an authorized agreement in answer to the next interrogatory. For the third question asked if Gulf had breached "any agreement [not "arrangements," and not the narrowly defined "agreement" of the first interrogatory] with Studley made with Gulf's authority or ratified by it with knowledge thereof." Without laboring the point or attempting to exhaust the possibilities, the affirmative answer to this question could reflect (1) an authorized "agreement" unlike that in the first interrogatory, (2) a ratified agreement of the same kind, or (3) a ratified agreement like the one in the first interrogatory.

The decisive point, we hold, is that the answers to the special questions do not lead inevitably, by logic or otherwise, to the conclusion that the jury rested upon ratification alone rather than authority as the basis for the contract it found Gulf to have breached. Since there was unquestionably evidence (as we found on the prior appeal) to support a finding of authority, the verdict for plaintiff may not be nullified.[7]

It makes no difference whether, in conjuring with the special questions and the jury's answers, we might in some sense deem it more or less "probable"

---

6. See note 3, *supra*.

7. In addition to denying that it had any obligation to do so, defendant argues that it actually made full and timely disclosure to Rock-Uris of plaintiff's services preceding the lease. This factual contention,

rejected by the jury and not adopted by Judge Pollack, is urged now as alternative ground for sustaining the judgment below. The record reveals that the jury, depending upon its appraisals of credibility, could have gone either way on this question. This ends the subject for us.

that the jury found no authorized agreement. It is sufficient that the answers may be read to include a finding of authority as a rational and valid possibility. Given our duty to save rather than destroy the general verdict "if it is possible" and "by exegesis if necessary," Gallick v. Baltimore & O. R. Co., *supra*, 372 U.S. at 119, 83 S.Ct. 659, we perceive no difficulty in sustaining the jury's ultimate determination that plaintiff should have an award of $25,000.

The judgment of the District Court is reversed and the case is remanded for entry of an appropriate judgment upon the verdict in plaintiff's favor.[8]

LUMBARD, Chief Judge (dissenting):

I dissent.

While I must admire the ingenuity of the majority opinion I do not believe it is appropriate for appellate judges to go to such lengths to rescue a plaintiff's case. Plaintiff's counsel elected to have the case go to the jury with the five interrogatories that Judge Pollack posed. Counsel did not request that the theory upon which the majority now awards judgment be submitted to the jury,[1] and this court should not attempt to predict what the jury's verdict would have been had this theory been submitted. In any event I feel that the retrospective surmise of the majority is improbable. It seems very likely to me that the jury proceeded upon the theory of ratification, and we are all agreed that

the evidence could not sustain a recovery on this ground.

There is another reason why we should not conclude that Judge Pollack's first interrogatory did not fully submit to the jury the contract basis of plaintiff's complaint. Judge Pollack's interrogatory followed very closely the wording of this court's prior opinion in this case. We said that to get to the jury on its contract claim the plaintiff had to offer sufficient evidence to support a finding, *inter alia*, that:

"there was a promise on Gulf's part, if a lease agreement for such office space were consummated, that the plaintiff would be designated by Gulf to the lessor Rock-Uris as the broker in the transaction * * *." 386 F.2d at 165.

Judge Pollack's first interrogatory is set out at page 525 of the majority opinion. I believe that it fairly submitted to the jury the holding of this court respecting the contract claim. We should not, at this late date, in effect modify our prior holding, particularly since plaintiff did not suggest to the district court the theory now adopted by my colleagues. Any ambiguities in the wording of the first interrogatory were clarified by the court's charge, to which no objections are raised by the plaintiff.

Accordingly, I would affirm the district court order which set aside the verdict and directed entry of judgment for the defendant.

8. As a briefly stated final point of its brief, plaintiff-appellant asks that we award it interest upon the judgment in accordance with N.Y. CPLR § 5001. Without suggesting that the request is unsound (the appellee makes no response to it), we think it should properly be put to the District Court rather than this Court in the first instance.

1. The only objection raised by plaintiff's counsel to the first interrogatory, and his only request for a further interrogatory, is contained in this somewhat obscure passage:

"I ask your Honor to charge the jury and I ask your Honor to leave another

special question to the jury: that aside from a specific contract between Gulf and Studley, that Gulf would name Studley as the broker[,] [t]here was an obligation of Gulf to act in good faith. That is a separate thing, and just having Studley be named as broker." Appendix at 95a.

The court did charge that "it was the obligation of the defendant to act in good faith * * *." Appendix at 98a. Counsel's objection did not call attention to the alleged ambiguities found by the majority to be inherent in the first interrogatory.