**RADIATION DYNAMICS, INC.,**
**Plaintiff-Appellant,**

v.

**Lawrence GOLDMUNTZ et al.,**
**Defendants-Appellees.**

**No. 138, Docket No. 71–1443.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1971.

Decided July 5, 1972.

Arnold C. Stream, Edward M. Berman, New York City (Netter, Lewy, Dowd, Fox, Ness & Stream, New York City), for appellant.

Ben Herzberg, Julian L. Weber, New York City (Botein, Hays, Sklar & Herzberg, New York City), for Goldmuntz.

P. B. Konrad Knake, Orison S. Marden, Carson Frailey, New York City (White & Case, New York City), for Hollybrook, Hollern, and Brooks.

James F. Kirkham, Donald S. Zinn, San Francisco, Cal., John R. Hupper, New York City (Pillsbury, Madison & Sutro, San Francisco, Cal., Cravath, Swaine & Moore, New York City), for Fisher and the California Group.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

**WATERMAN, Circuit Judge:**

This action was commenced in the United States District Court for the Southern District of New York by the appellant, Radiation Dynamics, Inc. (RDI) in May 1968. In its complaint RDI charged that the thirteen defendant-appellees had violated, *inter alia*, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5, when in the summer of 1964 the defendants purchased from the plaintiff 6500 shares of stock in a company then known as Technical Research Group, Inc. (TRG), without disclosing to plaintiff allegedly material inside information which plaintiff alleged was known to the defendants, being information that TRG at that time had general plans to seek a merger and that at the time the defendants purchased plaintiff's TRG stock, TRG was conducting merger negotiations with Control Data Corporation which negotiations led ultimately to a merger between those two corporations. The case was tried before the Honorable Milton Pollack and a jury. After all the evidence had been submitted the trial judge determined that the plaintiff had "failed to produce a scintilla of evidence" that the defendants Hollybrook Co., John M. Hollern and Conley Brooks, individually and under the trade name and style of Allbrook Co. (hereinafter referred to as the Minnesota Group) had any knowledge of the allegedly material inside information and, accordingly, directed a verdict dismissing the complaint against that group of three defendants, D.C., 323 F.Supp. 1097. The case against the remaining defendants was submitted to the jury which decided by answering questions given it in a special verdict that the defendants Lawrence Goldmuntz, Philip A. Fisher, individually and under the trade name and style of Fisher & Co., and a group of eight defendants hereinafter referred to as the California Group [1] did

1. Included in the California Group are the following: Philip A. Fisher, individually and under the trade name and style of Fisher & Co., Provident Securities Company, William H. Crocker II, Clarence E. Heller, Alfred E. Heller, Eliz-

not "have *material* information as to a *reasonably possible* acquisition or merger with Control Data" at the time that the "commitment[s]" for the sale of the stock purchased by them were made. Judge Pollack entered judgment for the defendants on March 26, 1971.

In its appeal from the judgment, RDI has broadly challenged Judge Pollack's handling of the trial. RDI strongly asserts that the circumstantial evidence which it marshaled against the Minnesota Group was more than ample to get its case to the jury. Moreover, it levels a volley of complaints against the district court's charge to the jury at the end of the trial. Scattered throughout RDI's brief are contentions that the judge misstated the law so as to favor the defendants, that the plaintiff was denied "equal time" in the summation of the evidence given to the jury by the court, and that the special verdict form "destroyed any chance that the appellant might otherwise have [or] still had to secure a proper jury determination." Indeed, RDI characterizes the District Court's handling of the case as one of "relentless opposition . . . to the appellant's case theory." We are unable to agree with any of the appellant's numerous objections to its treatment by the court below. Accordingly, we affirm the judgment below and will discuss the legal contentions of the parties in greater detail after an exposition of the facts in the case.

As we indicated in the first paragraph of this opinion, the significant events involved in this case are the sales of the TRG stock and the merger of TRG and Control Data. These events unfolded over a period of many weeks and, although they are to some extent overlapping in time, for the sake of clearly presenting the facts involved in each of them as those facts were developed at trial, we have treated each of them separately here.

*The Sales of the TRG Stock:*

The 6500 shares of TRG stock involved in this case were originally part of the portfolio of stocks held by a small investment trust known as deVegh International, Limited, and they were purchased by the plaintiff in mid-1964 as part of an RDI plan designed to stave off economic disaster for RDI. RDI at the time had assets totalling a few million dollars, was a company interested in the advanced technological field, and it appears from the record had not enjoyed great success since its incipience in 1958. In the spring of 1964, RDI badly needed working capital and the marketable securities in the deVegh portfolio, including the TRG stock here under consideration, presented RDI with the means of obtaining that capital. Prior to the acquisition of the portfolio, the RDI management had evolved two alternate routes by which these securities could be turned into cash. The simplest plan was to resell the marketable securities quickly. The alternate route involved the creation of a subsidiary corporation which would hold the assets acquired from deVegh. The corporate stock of that subsidiary would then be pledged as collateral for a substantial loan. With these two alternatives in mind, RDI signed a purchase agreement with deVegh on June 11, 1964, whereby it contracted to acquire deVegh's assets in exchange for 42,150 shares of RDI common stock. After a series of delays, this deal was finally closed on July 30, 1964.

As might be expected, the two alternative modes of financing had, prior to the signing of the purchase agreement, been the subject of a good deal of investigation by RDI management and, in particular, by Harvey Cohen, the Secretary and General Counsel, for RDI. As a part of that investigation Cohen made a telephone call in late May to Lawrence Goldmuntz, a defendant-appellee herein, who was then the chief executive of TRG. At that time TRG was a company engaged

abeth Heller, Sigvald Nielson, Louis M. Housman, The Bank of California, N.A., Trustee under and for the Wilbur-Ellis and Connell Bros. Profit-Sharing Trust.

in research and development in the technological and scientific fields and it had assets totalling in the neighborhood of three and a half million dollars. Its stock was not registered or traded on any securities exchange and there was no regular market for its shares. Apparently the main purpose behind Cohen's telephone call was to check into the likelihood of there being a market for the TRG shares for, during their conversation, Goldmuntz referred Cohen to a possible purchaser, Aerojet General Corporation, which, having purchased a small block of the TRG stock a short time earlier, then owned 15% of the TRG stock. Goldmuntz also told Cohen that if a sale to Aerojet could not be arranged he might be able to refer Cohen to other possible purchasers. When it became clear by June 24 that Aerojet was not interested in acquiring the TRG stock then in the deVegh portfolio Cohen followed up on Goldmuntz's suggestion and again called Goldmuntz.

It was either during the June 24 conversation or in one they had only a few days thereafter that Goldmuntz, himself, agreed to buy 500 shares of the deVegh TRG stock at $46 per share.[2] It appears also that during one of these conversations Cohen asked Goldmuntz to see if anyone else at TRG would be interested in acquiring some of the deVegh TRG stock, and with his letter of July 10 confirming his own agreement to buy 500 shares Goldmuntz included an order by one Fred Mayer to buy 200 shares.[3] That letter contained a proviso to the effect that Goldmuntz would purchase the stock "provided [it] becomes available by the end of July 1964." We have above stated that the deal between deVegh and RDI was closed on July 30 and,

in turn, Goldmuntz formally completed his 500-share transaction with RDI on August 17.

During the telephone conversation of June 24 between Cohen and Goldmuntz, Cohen was also referred to one Philip Fisher, a defendant-appellee. Fisher, a San Francisco investment advisor, who did business under the trade name and style of Fisher & Co., was an acquaintance of Goldmuntz and he had a degree of familiarity with the affairs of TRG.[4] Shortly before June 24 Goldmuntz had been on the west coast and had been in contact with Fisher. He had learned that in late 1963 Fisher had arranged for the purchase from deVegh of about 3000 shares of TRG stock and had attempted unsuccessfully to obtain an additional 3000 shares in early 1964. Goldmuntz knew that Fisher was still interested in obtaining a substantial portion of deVegh's block of TRG and on June 24 Goldmuntz conveyed this information to Cohen.

RDI acted quickly and, two days thereafter, by telegram and confirming letter, it offered 3000 shares of the deVegh TRG stock to Fisher at $46 per share. Fisher answered, confirming the offer as to such particulars as the stated price per share and the number of shares offered, but he also informed RDI that his interest in the stock was not on his own behalf but rather on behalf of a group of Californians whom we have designated in this opinion as the "California Group." In a letter dated June 29, 1964, Fisher listed the prospective purchasers and suggested the mechanics by which the sales to the California Group might be made. He proposed that when RDI was in a position to make firm offers

2. Goldmuntz testified on direct examination that he could not remember whether it was in one conversation or in two that he agreed to buy TRG stock for himself and referred Cohen to other potential buyers.

3. By mid-August it became apparent to RDI that Mayer was not going to complete the transaction and, having placed all the shares except the 200, RDI in-

quired as to whether Goldmuntz would discharge the obligation. Goldmuntz agreed, and their deal was closed on September 1.

4. Fisher testified that he had become interested in TRG as a company in mid-1962 and at that time began to investigate the company as an investment possibility.

it make them directly to the individuals in the group. RDI acted upon Fisher's suggestion and offers were mailed off by RDI on July 14, to remain in effect until July 30. It was stated in these offers that the closing between RDI and de-Vegh was scheduled for July 20 and that RDI would then close the deal between it and its own purchasers on July 23.

The closing between deVegh and RDI did not take place on the twentieth as scheduled, and on that date Cohen wrote to Fisher asking that the buyers from California refrain from sending in their acceptances, because, as Cohen told Fisher, certain developments had occurred which might prevent the completion of the RDI-deVegh transaction. Actually, some members of the California Group had already accepted RDI's offer, but Fisher told RDI that RDI would not be required to honor those acceptances and that he would see to it that no further acceptances were sent in until he was notified that RDI was in a position to sell the TRG stock it was offering. Finally, on July 28, Fisher was told by Cohen that the RDI closing with deVegh was definitely taking place on July 30 and that the remaining acceptances should be sent in as soon as possible. Those acceptances were received by RDI by the end of July and the sales by RDI of the block of TRG stock to the California buyers were closed on August 3, 1964.

Cohen sought advice from Fisher about disposing of the remaining 2800 shares of TRG stock in the deVegh portfolio, and in early July, Fisher suggested that RDI engage the services of the investment banking firm of Smith, Barney & Company. Smith, Barney & Company had, in a previous year, investigated TRG, and, therefore, it appeared to Fisher that it might be in a good position to place the stock. On July 15 Cohen engaged the firm as RDI's agent and broker to sell the 2800 shares of TRG stock. By mid-August Smith, Barney & Company had arranged to place the stock with its Minneapolis customers, John M. Hollern and Conley Brooks.

Hollern and Brooks managed investments for a large family group in Minnesota. A partnership, Allbrook & Co., acted as nominee to hold the investments Brooks managed. Hollybrook & Co. acted as nominee to hold the investments managed by Hollern. Hollern, Brooks and the entities they managed have been designated for the purposes of this appeal as the "Minnesota Group." The RDI's TRG stock formally passed to the Minnesota Group on August 31.

### The Merger

The above summarized events which culminated in the sale by RDI of the shares of TRG stock which originally had been part of the deVegh portfolio unfolded over a period of somewhat more than two months. During that period events also occurred which led to the merger between TRG and Control Data. We turn now to that part of the story.

Plaintiff-appellant contended below that at the time it acquired and sold TRG stock the financial situation of TRG had caused that company to decide actively to seek and to pursue a merger with another company, and that "[t]he Control Data-TRG merger [did not spring] fullblown like Minerva from the forehead of Zeus." The defendants do not deny this. Indeed, Goldmuntz's previously mentioned trip of June 22 to the west coast was to explore the possibilities of a merger between TRG and Aerojet General Corporation, the company which Goldmuntz had suggested to RDI's Cohen might be interested in acquiring more stock in TRG. Needless to say, in light of the subsequent events, a merger with Aerojet did not materialize. RDI contends, however, that the significance of merger discussions between Aerojet and TRG reflected a determination by TRG to seek a merger with any larger company, any company which could provide it with the additional financial resources it needed to enable it to carry forward production of devices based upon the ideas on which TRG had done research and development.

The evidence points strongly to the conclusion that during the first half of 1964 the possibilities of a TRG merger with some other company had been discussed by the officers of TRG and that there was sentiment among certain of those officers favoring such a course of action. Notably, Dr. Kay,[5] one of TRG's vice presidents, strongly took the position that TRG should be acquired by a larger company. During those discussions the representative of the Aerojet General minority stock interest on the TRG Board of Directors urged that if there were to be any merger Aerojet's interest should be considered, and this led to the abortive discussions between TRG and Aerojet.

In late May or early June, apparently in response to the discussions which were taking place at TRG, Dr. Richard Geiger, a Director of that company,[6] mentioned to George Schuster that TRG, as well as some other companies, was a possible merger candidate. Schuster, the head of George Schuster & Company, Inc., was a "finder" whose function was to arrange for corporate mergers or to secure financing for corporations. He was aptly termed by Judge Pollack as a "corporate marriage broker." Geiger testified that he contacted Schuster entirely on his own initiative and that he did not speak to anyone of his intention to do so before he made the overture.

Schuster quickly got in touch with his longtime personal friend, Dr. John Baird, who was then the Director of Research for Control Data Corporation, a computer company. Baird, in turn, conferred with the President of Control Data, William Norris, and with a Mr. Keye, who was also with Control Data. After having obtained a Dun & Bradstreet Report on TRG, the Control Data people then arranged through George Schuster for Keye and Baird to visit TRG's offices in New York.

That visit by Keye and Baird was on July 1 and it was apparently the first meeting between TRG and Control Data. At that time the representatives from Control Data interrogated Goldmuntz with the stated purpose of familiarizing themselves with TRG as a company and, according to Dr. Baird's testimony, their entire discussion was aimed at the possibilities of an acquisition of TRG by the larger company. There was, however, no discussion of price or terms of merger. Moreover, Goldmuntz testified that at the termination of the talks he was unclear as to what Control Data's intentions might be regarding his company.

The next time the men met was on July 24 when Goldmuntz and one of TRG's vice presidents, Jack Kotik, visited Control Data's headquarters in Minnesota. At this time there was no doubt in anyone's mind as to what was being discussed, and, even though the specific terms of a merger were not considered, it was about this time that Control Data's five year projections were released to TRG. As testified to by Baird, such a step was not normally taken unless the parties were seriously considering a merger. By mid-August a similar projection report about TRG had been prepared by Goldmuntz for Control Data.

During the month of August terms for the exchange of corporate stock were discussed, but there is evidence that it appeared to the parties that they were so far apart that agreement could not be reached. Control Data wanted to exchange its stock for that of TRG at a ratio of one to one while Goldmuntz was holding out for an exchange ratio of 1.5 shares of Control Data for each share of TRG. It was not until September 14, when Control Data increased its offer to 1.2 shares of its own stock for each share of TRG, that a compromise appeared possible. Shortly thereafter, Control Data's offer was again increased, this time to 1.275 shares of Control Data for each share of TRG, and, on September 23, the two companies issued a public statement that they had in principle reached an agree-

---

5. The name was variously spelled as Kay and Kaye in the transcript.

6. Dr. Geiger was also on the Boards of RDI and deVegh International.

ment to merger. The merger agreement was signed on November 12, and shares in the two companies were finally exchanged on December 9, 1964.

As a result of the merger the defendant-appellees, who had purchased the TRG stock from RDI in the previously discussed transactions, received tremendous profits. Plaintiff pointed out below that within six months after the final exchange of shares the defendants had sold for a total sum of $690,270 all of the shares of Control Data which they had received in exchange for their TRG stock, thereby realizing a profit of $391,270 on their original investments of $299,000. The appellant accepts with some grace the epithet of "disgruntled seller" and urges here, as it did in the court below, that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10 b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5, required the buyers to disclose to RDI prior to the closing of the RDI sales to them any information known to the buyers concerning TRG's general plans to seek a profitable merger and concerning the specific merger negotiations then in progress between TRG and Control Data. RDI contends that Goldmuntz and Fisher were knowledgeable "insiders" with reference to TRG material corporate information.[7]

RDI also tried to establish in the proceedings below that the defendants from Minnesota were "tippees" of the material inside information, either as tippees directly from the insiders, Fisher, Goldmuntz or Control Data, or indirectly through Smith, Barney & Company. As such tippees their liability for acting upon information so obtained by them would be the same as though they themselves were insiders. As to this group of defendants, however, Judge Pollack ruled that RDI had failed to adduce sufficient evidence that they were privy to insider information so as to warrant submission of plaintiff's case against them to the jury and granted the Minnesota defendants' request for a directed verdict. The case against the remaining defendants was submitted to the jury which brought in a verdict in favor of them.[8]

### Discussion

As we indicated at the outset of this opinion, RDI's challenge to the proceedings below is exceedingly comprehensive in scope. It charges, *inter alia*, that the trial court erred when it ordered a directed verdict in favor of the Minnesota

7. It is not disputed that the liability to RDI of the other California defendants depends upon whether Fisher is liable, for, as is pointed out in the brief for that group of defendants, "[t]he members of the California group simply followed the advice of Mr. Fisher and their responsibility in this matter turns upon that of Mr. Fisher."

8. By the special verdict submitted to it the jury was first instructed to report by answering questions 1 and 2 as to whether it believed at the time of their respective commitments to buy the TRG shares that the defendants had material information as to a reasonably possible acquisition or merger with Control Data. If the jury believed that defendant Goldmuntz or the California defendants did possess such information at the applicable time, the jury was to answer further relevant questions. The jury found for the defendants and checked the "No" column in its answer to questions 1 and 2.

The language the court employed in submitting these two questions follows:

SPECIAL JURY VERDICT

Please check the applicable answer:
1. Did the defendant Goldmuntz have *material* information as to a *reasonably possible* acquisition or merger with Control Data?

| | Yes | No |
|---|---|---|
| (a) When the commitment was made for 500 shares | —— | —— |
| (b) When the commitment was made for 200 shares | —— | —— |

2. Did the California defendants through Mr. Fisher have *material* information as to a *reasonably possible* acquisition or merger with Control Data when the commitment was made for the 3000 shares?

| Yes | No |
|---|---|
| —— | —— |

Group. It contends that the trial court demonstrated a stubborn and relentless opposition to its efforts to support its theory of its case and that this opposition resulted in the prejudicial exclusion of evidence which should have been admitted and in the prejudicial introduction of evidence which should have been excluded. Appellant's primary area of concern, however, is its interpretation of the charge which the district judge gave to the jury when submitting the case, for it is RDI's contention that Judge Pollack totally failed to provide the jury with the basic tools it needed to understand the nature of a claim arising under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities Exchange Commission. Appellant states that the trial court gave the jury erroneous definitions and concepts by which to determine the materiality of the allegedly undisclosed information. Appellant also claims that the court failed to provide in its charge "basic guidelines to the stages of a merger or acquisition" so that the jurors could better understand "the mystique of corporate finance and business," and that it failed to include in the charge a summary of the specific events which led to the merger between TRG and Control Data. Appellant maintains such a summary was necessary if the jury were to make a meaningful determination of the materiality of the information about which the defendants were allegedly aware when they acquired the stock RDI sold them. Moreover, according to RDI, the jury's assessment of whether this information was material information was further hampered because of an instruction it claims was given to the jury that the jury was to determine the materiality of the information undisclosed to RDI "by weighing self-serving testimonial assertions of the *appellees* as to the *improbabilities* of the success of the pending negotiations in-stead of instructing it to consider whether knowledge by an *appellant* of the *possibility* of a merger would have been an important fact to it." [9] Appellant claims that the trial court committed error by instructing the jury to determine materiality as of a date before the securities were transferred and paid for, and by instructing that materiality "had to be decided as of the dates of certain earlier 'commitments,' a term which had no legal currency and which the Trial Judge never defined or explained to the jury . . . ." [10] Finally, RDI asserts that the charge, in general, was an unbalanced one, that it favored the appellees, and that the form of the special verdict was prejudicial. For any and all of these reasons, the appellant seeks reversal of the lower court determination.[11]

In our discussion of the appellant's claims we first consider the propriety of the order directing a verdict in favor of the Minnesota defendants.

The standard by which a trial judge must determine whether there is insufficient evidence to warrant the submission of a case to the jury was stated by the Supreme Court in Baker v. Texas and Pacific Railway Co., 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959): "Only if reasonable men could not reach differing conclusions on the issue may the question be taken from the jury." *Accord*, Julian J. Studley, Inc. v. Gulf Oil Corporation, 386 F.2d 161 (2 Cir. 1967). When it directed the verdict the trial court had satisfied itself that this standard had been met. It pointed out that "[t]he plaintiff has failed to produce a scintilla of evidence or any inference which could be drawn from evidence inculpating the [Minnesota] defendants on any fraud on the plaintiff whether 10(b)(5) [sic] or any other." From our examination of the trial min-

9. Appellant's brief p. 3.

10. Appellant's brief p. 3.

11. Appellant also argues that there were errors in the judge's charge relating to the measure of damages and to the rules relating to the liability for damages applicable to each of the defendants jointly and severally. In light of our disposition of the other issues we find it unnecessary to reach these latter issues.

utes we support the trial judge in this analysis of the evidence.

The problem facing RDI in its effort to upset this ruling is that it failed to produce any evidence, direct or circumstantial, to support its contention that either the Minnesota defendants or Smith, Barney & Company, the firm that placed the stock with them, had any knowledge of the negotiations that were taking place between Control Data and TRG. Essentially, RDI's argument on appeal boils down to the contention that the mere fact that the Minnesota Group purchased the stock is circumstantial evidence that they were privy to the insider information. It points out that prior to this purchase of TRG stock Hollern and Brooks had purchased very little stock on behalf of their fiduciary accounts through private placement. Nevertheless, it was shown that approximately eight months before the purchase of the TRG stock, the Minnesota Group had purchased about $50,000 worth of shares in another unregistered company. Indeed, the mere purchase of unregistered stock as opposed to that of registered stock does not appear to be such a marked deviation from the past practice of the purchasers as to support an inference that its purchase here was motivated by an awareness of the impending merger.

Contrary to RDI's highly editorialized and somewhat misleading version of Hollern's and Brooks's testimony, there was no evidence pointing to anything unusual in the manner by which the Minnesota defendants decided to purchase the stock. Their testimony was that they managed investments for a large family group, that they consulted together on investments, and that they used the same investment advisers. At the time of the transactions in question, they had retained as one of their advisers Smith, Barney & Company and, because of that fact, they were in almost daily contact with the firm. According to their testimony, at some time in mid-August their contacts at the New York investment firm called them to discuss TRG as an investment possibility and recommended to them that the Minnesota Group purchase the TRG stock which Smith, Barney & Company knew to be available. Hollern and Brooks then discussed the possibility and acted upon the recommendation. Hollern testified that they acted upon the recommendations of their adviser about 90% of the time. There was no testimony or evidence to contradict that given by Hollern and Brooks.

We cannot agree with RDI's conclusion that it was "unbelievable" that Smith, Barney & Company would have recommended the stock to the Minneapolis purchasers without an awareness of the impending merger. RDI had engaged Smith, Barney & Company to place the TRG stock and that investment firm was the adviser to the Minnesota Group. All indications point to the conclusions that TRG in and of itself was not an unwise investment and, moreover, TRG was not an "unknown" company to Smith, Barney & Company because, as the plaintiff-appellant acknowledges, it had done a survey on TRG for possible financing in the previous year.

■■ Thus, in the face of the unequivocal denials of the defendants, the appellant presented this court, as it presented the court below, with a case bottomed on nothing more than speculation and guesswork. That speculation is highlighted by the following passage in its brief:

> First of all, why must it be assumed that the Minneapolis defendants gained their inside information from Smith, Barney? Was it not equally inferable that the tip came from sources within Control Data? Or if not from there, from Fisher, himself?

The Supreme Court has held that the jury should be spared the necessity of deliberating upon such conjectural material, when it stated in Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed.2d 1458 (1943) that "the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferenc-

es favoring the party whose case is attacked." Moreover, as was pointed out by Judge Haynsworth in Ford Motor Company v. McDavid, 259 F.2d 261, 266 (4 Cir.), cert. denied, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958), "Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." The inferences which the appellant would have us draw from the meager evidence which it presented in the court below against the Minnesota Group are far too tenuous and conjectural for us to upset Judge Pollack's determination, and we affirm his decision to direct a defendant's verdict as to these defendants.

■ Turning now to a consideration of the charge given by Judge Pollack to the jury we observe that the role played by a federal district judge in a jury trial is crucial. Indeed, as the Supreme Court pointed out in Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 13 (1933), "the judge is not a mere moderator, but is the governor of the trial" and as such the influence of his words upon the jury are necessarily of great weight. Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 (1894): Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). This is especially true in cases such as this one involving legal concepts which are not readily understood by the laymen who compose the jury. To Judge Pollack fell the difficult task of conveying to the jury the substance of this court's recent decisions involving the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities Exchange Commission, and while, as we have noted, the judge's charge is of special significance, we point out that the question before us is whether, from a fair reading of that charge as a whole, Judge Pollack stated the law as it has been interpreted by this court.

■ Rule 10b–5 was intended to prevent those in possession of material inside information from using that information to their own advantage when dealing with others not possessing the same information. Quite simply, one in possession of material inside information, be he an insider or a tippee, "must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or if he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2 Cir. 1968), cert. denied, sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968); see also, List v. Fashion Park, Inc., 340 F.2d 457 (2 Cir.), cert. denied, sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). The rule applies whether the securities are traded on a public stock exchange or sold through private placement. Moreover, the standard by which the materiality of the information is to be determined is clearly defined. The basic test as it was phrased in List v. Fashion Park, *supra* at 462, and quoted in SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 849, is "whether a *reasonable* man would attach importance [to the information] in determining his choice of action in the transaction in question. Restatement, Torts § 538(2) (a); accord Prosser, Torts 554–55; I Harper & James, Torts 565–66." (Emphasis supplied [in the *Texas Gulf Sulphur* case]). Moreover, "whether facts are material . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." SEC v. Texas Gulf Sulphur, *supra* at 849. Those principles were recently reaffirmed by this court in Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2 Cir. 1971).

■ Contrary to RDI's assertions, those principles were fairly conveyed to

the jury in Judge Pollack's charge. The trial judge stated to the jury, "The essence of Rule 10b–5 is that an insider who has material inside information or a person who has obtained such information from an insider may not thereafter use that material information in connection with the purchase or sale of securities, so as to take advantage of such information knowing it is not available to those with whom he is dealing." On the matter of what constitutes material information, the trial court was also unequivocal: "a material fact is one which in reasonable and objective contemplation might effect [sic] the value of the security if the supposed-to-be extraordinary situation were disclosed. You must consider both the likelihood that the event will ultimately take place and the importance of it, if it does take place." The question, as Judge Pollack placed it before the jury, "is whether disclosure might have influenced RDI's decision to sell the stock or to sell it at $46 a share."

We are satisfied that the passages, quoted *supra*, are representative of the three hour charge in question, and that the jury in the instant case was adequately apprised of the nature of the wrong which RDI alleged the defendants perpetrated. A comparison of the judge's charge to the jury with the law as we have stated it reveals that RDI has no basis for its claim that the district court's charge involved an "erroneous" or "obsolescent" definition of materiality. Indeed, in this area, it appears that the court incorporated into its instructions the wording used by the plaintiff below in its Requests to Charge.

We do not agree with the appellant that the jury's understanding of the concepts involved was impaired by Judge Pollack's failure to include in the charge the theoretical "guidelines of" or "stages of" a merger which were suggested in

the appellant's brief.[12] Moreover, as to RDI's suggestion that knowledge of an unfolding merger transaction becomes material information at any one of the suggested theoretical stages, we can only point out, as we did in SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 849, that such "materiality" must be determined on a case-to-case basis according to the fact pattern of each specific transaction. For the determination of whether information is material or, alternatively stated, of whether such information would have affected the actions of a "reasonable man" the jury is the appropriate body.

Appellant also claims that the jury was unable to make a meaningful determination of materiality because the judge failed to place the facts in "chronological perspective" and improperly summarized the evidence. Those contentions are without merit and warrant little discussion. We begin by observing, as did the court in United States v. Tourine, 428 F.2d 865, 869 (2 Cir. 1970):

> The trial judge in a federal court may summarize and comment upon the evidence and inferences to be drawn therefrom, in his discretion. This does not mean that he must include every scrap of evidence as if the jury were dependent upon the court's summation alone as the basis for its deliberations. United States v. Kahaner, 317 F.2d 459, 479 (2 Cir.), cert. denied Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963).

The treatment the district judge accorded to the evidence here was well within the perimeter of discretion traditionally afforded to trial judges when summarizing evidence in lengthy cases for the benefit of the jury.

Here Judge Pollack included in his charge to the jury a brief statement of

---

12. "In the mystique of corporate finance and business, the least which should have been provided to the jury were basic guidelines to the stages of a merger or acquisition. For example, such a transaction normally includes, although not necessarily in this order, (1) conception, (2) investigation, (3) initial assessments, (4) negotiation, (5) fixing of terms, (6) formal agreement, (7) shareholder approval, and (8) implementation." Appellant's brief p. 16.

the contentions of the various parties. He included in that statement RDI's contention that early in June TRG was already pursuing general plans to seek a merger and that those plans were demonstrated by the unsuccessful negotiations between TRG and Aerojet General. He also pointed out that it was RDI's contention that the initial contacts between TRG and Control Data came at least by early June and, finally, he summarized the plaintiff's arguments that at the time of the transactions between RDI and the defendants the negotiations between TRG and Control Data had reached such a material stage as to require disclosure of their knowledge of the negotiations to the plaintiff.

 Essentially, RDI is really complaining that the court did not include in its charge the plaintiff's version of all of the facts. The statement of facts which RDI asserts should have been included in the charge is, to say the least, one-sided, and, at points it has scant, if any, support in the record. Certainly the court was not bound to adopt RDI's "facts" as the court's own factual conclusions nor was it, as we have indicated, the court's duty to summarize all the evidence in the case.

 RDI is also piqued because the court devoted more lines of typewriting to its summary of the defendants' position than it accorded to its summary of that of the plaintiff. It claims to have been denied the right to "equal time" in the charge. It is understandable that in an election year a term like "equal time" might become the subject of increased use and abuse. We were not aware, however, that the "equal time" concept has become so expanded as to extend to a judge's charge to the jury. The guiding principle, as we understand it, was stated in United States v. Tourine, *supra*, 428 F.2d at 869:

> So long as the trial judge does not by one means or another try to impose his own opinions and conclusions as to the facts on the jury and does not act as an advocate in advancing factual

findings of his own, he may in his discretion decide what evidence he will comment upon. His fairness in doing so must be judged in the context of the whole trial record, particularly the evidence and the arguments of the parties.

In the context of a record which amounted to about 1500 pages, it can hardly be said that a few extra pages of summary which the court devoted to the contentions of the numerous defendants represents so great an unfairness to the single plaintiff as to warrant reversal of the judgment below. We find no indication in the words of the trial judge that shows that he was attempting to impress his own fact-conclusions upon the jury. Rather, Judge Pollack made his intentions clear in the following statement to the jury:

> I have attempted—but only in broad outline—to put before you my recollection of some of the rival contentions and my recollection of some of the evidence. As I have said, and I repeat, my recollection is not necessarily accurate or complete, and, moreover, you are not to be influenced by the matters I have given you or the manner in which I have done so. My statement is not binding upon you in any respect
> . . .

 It was apparently because of the judge's summary of the defendants' contentions that the plaintiff surmised that the court was instructing the jury to use a subjective defendant-oriented standard by which to judge the materiality of the information possessed by the defendants. However, when the court referred to the fact that "Goldmuntz says" or "the defendants contend," it was merely making clear to the jury that it was expressing the positions of one of the parties. When stating the positions of the plaintiff the court used similar terms (i. e., "the plaintiff claims" and "the plaintiff contends"). Judge Pollack's instructions clearly set forth the standard by which materiality was to be judged. He instructed: "The test then

of materiality is whether a reasonable man would attach importance to the status of the inter-corporate contacts in determining his choice of action in the transaction in question." There could have been no doubt in the jury's mind at the conclusion of the charge that the materiality of the defendants' information was not to be looked at subjectively, through the eyes of the defendants, but rather, objectively, through the eyes of the "reasonable man."

Finally, we turn to the contentions of the appellant which relate to the frequent use by the trial judge of the word "commitment." RDI argues that there was error in Judge Pollack's instruction to the jury that the date at which materiality was to be determined was, in the judge's words:

. . . the date when an insider has committed himself to purchase the stock. It is not any later date, such as, for example, the formal closing date when the delivery and payment are formally completed and cleared. To determine whether fraud was perpetrated you look to the situation at the date when the parties committed themselves. There is no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge.

It is RDI's contention on appeal that the proper date at which to determine materiality is the date when securities are transferred and paid for; that, at any rate, the term "commitments" is "vague" and connotes an "ethical" rather than a "legal" concept for judging a business transaction, and the use of commitments in Judge Pollack's charge left no firm guidelines by which the jury could fix a date for determining the materiality of information.

■ We note in passing that because appellant made no requests during the trial for a more specific charge on this point, it would normally be barred from raising the point on appeal. United States v. Ballentine, 410 F.2d 375, 377 (2 Cir. 1969); Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 445 (8 Cir. 1961). The problem, however, is important, and was not squarely considered in our previous opinions of Texas Gulf Sulphur, *supra,* and List v. Fashion Park, *supra.* Those cases involved relatively speedy sales of securities and the trial courts could easily ascertain for the purposes of Rule 10b–5 when the "purchase or sale" of the security took place. Here, however, the allegedly fraudulent purchases of TRG stock span a time period of over two months. The problem posed here for determination is whether the term "commitments" adequately expresses that stage of the "purchase or sale" transaction when disclosure of material information is required, but after which disclosure of late-learned relevant information is not necessary inasmuch as "the choice of action in the transaction in question" had been made before the later information was known. We believe that it does.

The appellant's initial contention that the proper date upon which to determine the materiality of information is the date, irrespective of when a party is bound by an offer or parties are bound by a contract to purchase or sell, the securities are transferred and paid for, disregards the clear and frequently stated policy of interpreting Rule 10b–5 so as to avoid reliance on formalism. As the Supreme Court remarked in Securities & Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237, (1963), when construing the Investment Advisors Act of 1940, it was the intent of Congress that the Act "be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes. [footnote omitted]." The essential purpose of Rule 10b–5, as we have stated time and again, is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders. SEC v. Texas Gulf Sulphur, *supra;* List v. Fashion Park, *supra;* Koh-

ler v. Kohler Co., 319 F.2d 634 (7 Cir. 1963). It was not intended to provide an escape hatch through which disgruntled buyers or sellers could avoid transactions to which they had become committed, but which had not been fully consummated by the formal exchange of the money or the securities agreed upon to be exchanged.

It was to effectuate the purpose of the Rule that we stated in SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 853 n. 17, "that the time that an insider places an order, rather than the time of its ultimate execution, be determinative for Rule 10b–5 purposes." See Ryan v. J. Walter Thompson Company, 453 F.2d 444, 447 (2 Cir. 1971); Fershtman v. Schectman, 450 F.2d 1357, 1360 (2 Cir. 1971). In keeping with such purposes, we hold that Judge Pollack correctly instructed the jury when he stated that the time of a "purchase or sale" of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another. A party does not, within the intendment of Rule 10b–5, use material inside information unfairly when he fulfills contractual commitments which were incurred by him previous to his acquisition of that information, for, as Judge Pollack instructed the jury, the Rule imposes "no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after acquired knowledge." The goal of fundamental fairness in the securities marketplace is achieved by such a determination.

In conclusion we add that we do not believe, as argued by RDI, that the concept of commitment is an improperly vague concept, or an ethical one only. "Commitment" is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time. The

term has the added benefit of being readily understandable by the jury.

We have examined appellant's numerous other claims of error and find them to be unworthy of further consideration.

The judgment of the court below is affirmed.