**Daniel KLAERS, Robert Andersen, Appellants,**

**v.**

**Peter ST. PETER, Appellee.**

**No. 90–5321.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1991.

Decided Aug. 22, 1991.

Randall L. Seaver, Minneapolis, Minn., for appellants.

Mary E. Steenson, Minneapolis, Minn., for appellee.

Before MAGILL, BEAM and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Plaintiffs Daniel Klaers and Robert Andersen, who were non-managing general partners in an unsuccessful real estate partnership, appeal the district court's[1] judgment dismissing their securities fraud action against Peter St. Peter for his alleged non-disclosures while serving as attorney and accountant for the partnership. The district court rejected plaintiffs' claim that a restructuring of the partnership and their subsequent capital infusions were independent securities purchases for purposes of federal and state securities laws. Accordingly, because St. Peter was not involved in events preceding the restructur-

---

1. The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of    Minnesota.

ing, the district court granted summary judgment dismissing plaintiffs' securities law claims on the merits and dismissing without prejudice their remaining pendent state law claims. We affirm.

Cathedral Hill Associates General Partnership (the "Partnership") was formed in 1984 to redevelop and manage an office and retail complex in St. Paul, Minnesota. Pursuant to a written Partnership Agreement (the "Original Agreement"), the 27 General Partners provided 80% of the Partnership's initial capital by contributing $15,000 each. The two Managing Partners provided 20% of the initial capital and were allocated 5% of all profits and losses plus a reasonable fee for their management services. All partners were liable for additional pro-rata capital contributions "at such times and in such amounts as deemed necessary by vote of the Partners."

The Original Agreement gave the Managing Partners sole authority for day-to-day management, but a "Voting" provision gave the General Partners 80% voting power on "any items of partnership business which will substantially affect the Partners." Subsequent to signing the Original Agreement, the General Partners executed revocable powers of attorney placing these voting rights with an agent of the Managing Partners.

By mid–1985, the partners had contributed their initial capital, the project was well underway, but the Partnership needed additional financing. St. Peter was retained in October 1985 in large part to negotiate with new lenders. Not surprisingly, the lenders' willingness to provide debt capital was conditioned upon the Partnership's ability to raise additional equity. When adverse changes in the federal tax laws eliminated the possibility of attracting new investors, the Managing Partners turned to the General Partners for the needed additional equity.

In addition to demanding more equity, prospective lenders expressed concern that the Original Agreement did not give the Managing Partners adequate authority to conduct Partnership business. To meet this concern, an Amended and Restated Partnership Agreement (the "Amended Agreement") was prepared. The Amended Agreement clarified the Managing Partners' authority to bind the Partnership and to encumber Partnership property. Of particular relevance to this case, the Amended Agreement also contained new provisions relating to partner capital contributions and voting rights. First, in place of the provision in the Original Agreement that partners were liable for additional pro-rata capital contributions "as deemed necessary by vote of the Partners," the Amended Agreement provided:

SECTION 3.2

(a) *Assessments.* Each Partner acknowledges that ... expenses incident to the business of the Partnership may exceed Partnership resources. Each Partner agrees to be assessed and to pay his or her pro rata share of any excess expenditures. Such assessments shall be capital contributions to the Partnership....

(b) *Assessments and Capital Contributions in 1986.* The obligations of Partners relative to assessments levied by the Managing Partners in 1986 shall be discretionary.... The discretionary obligation of the Partners to make capital contributions during 1986 shall not be construed to relieve the partners of their obligations under general partnership law relative to partnership obligations.

(c) *Assessments and Capital Contributions in 1987 and Years Subsequent.* The Managing Partners may levy assessments in accordance with Section 3.2(a) of this Article in 1987 and in subsequent years....

The Managing Partners were authorized to pursue a variety of remedies against partners failing to meet Section 3.2(a) "cash calls," including termination of partnership interests. Second, in place of the prior open-ended right of the General Partners to vote on any issue that would "substantially affect" them, Section 5.3 of the Amended Agreement, entitled "Voting Rights," provided that a "Partner Majority" would have only limited power to amend the partnership agreement, and

power to dissolve the Partnership, without the concurrence of the Managing Partners.

Plaintiffs and the other partners signed the Amended Agreement in October 1986. Pursuant to the Amended Agreement, Klaers made a "discretionary" contribution of $7,500 in 1986. Both Klaers and Andersen made "mandatory" contributions of $15,000 each in August 1987. They refused the Managing Partners' calls for additional contributions in later years, which led the Partnership and at least one lender to sue plaintiffs in state court for breach of their obligations as General Partners.

Plaintiffs filed this suit in August 1988, alleging that the Managing Partners and certain brokers had made actionable misrepresentations in soliciting plaintiffs' original Partnership investment, and alleging that the Managing Partners and St. Peter had failed to disclose potential and actual problems with the Partnership project when soliciting plaintiffs to sign the Amended Agreement and to make their additional capital contributions in 1986 and 1987.[2] St. Peter is the last remaining defendant. Plaintiffs' claims against the brokers were dismissed as time-barred, and all other defendants have settled.

Unlike the other defendants, St. Peter cannot be liable for any fraud that occurred in connection with plaintiffs' purchase of their initial Partnership interests in 1984 because he was not retained until late 1985. However, plaintiffs argue that their entry into the Amended Agreement in October 1986, and their subsequent contributions to Partnership capital, were securities purchases tainted by the fraudulent misrepresentations of St. Peter and the Managing Partner defendants. The district court granted summary judgment dismissing plaintiffs' securities law claims on the ground that these events did not involve purchases of a security, a decision

that we review de novo under the familiar summary judgment standards of *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). *See, e.g., Ulrich v. Saint Paul Fire & Mar. Ins. Co.*, 912 F.2d 961 (8th Cir.1990).

■ *The Amended Agreement.* Plaintiffs argue that their original Partnership interest was a security, that the Amended Agreement substantially modified their rights as securityholders, and therefore that entry into the Amended Agreement *without more* constituted a security "purchase." This is a plausible argument under cases such as *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977). However, it has a questionable premise—that plaintiffs' purchase of their original Partnership interest was the purchase of a security, that is, a transaction "whereby a person invests his money in a common enterprise and is led to expect profits *solely from the efforts of the promoter or a third party.*" *Securities & Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) (emphasis added). Here, plaintiffs were General Partners under the Original Agreement, liable for the debts of the partnership and possessing voting power to control the Partnership's affairs. Therefore we doubt whether their initial Partnership interest was a security. *See, e.g., Stewart v. Ragland*, 934 F.2d 1033, 1039 (9th Cir.1991).[3]

The very factors that made the original General Partner interest unlike a security—unlimited liability and voting control—were the focus of the 1986 partnership amendments. The Amended Agreement was executed after the project was underway, at the insistence of the Partnership's lenders, to clarify the Managing Partners'

---

2. Plaintiffs alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); S.E.C. Rule 10b–5, 17 C.F.R. § 240.-10b–5; § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2); and the Minnesota Securities Act, Minn.Stat. Ch. 80A. Plaintiffs also alleged state law claims for consumer fraud, negligence, breach of fiduciary duty, common law fraud, and conspiracy.

3. Plaintiffs were specifically told in 1984 that the General Partner interest was not being offered as a security—the Partnership's offering brochure cautioned, "THIS OFFERING IS NOT A SECURITY AND THUS IS NOT REGISTERED UNDER THE SECURITIES ACT OF 1933 OR PURSUANT TO STATE LAW."

control over the Partnership's day-to-day affairs and their power to make cash calls on the General Partners. In some respects, the Amended Agreement made the General Partners look more like passive securityholders.[4] However, these were management changes to an on-going enterprise, and under the Original Agreement, plaintiffs as General Partners had full voting power with respect to these management changes. Such changes do not meet the Supreme Court's definition of an investment transaction. Accordingly, on these undisputed facts, we agree with the district court that entry into the Amended Agreement did not result in plaintiffs' "purchase" of a "security."

■ *The Additional Contributions.* Plaintiffs' principal argument on appeal is that their capital contributions made after the Amended Agreement went into effect—Klaers's "discretionary" $7,500 contribution in 1986 and plaintiffs' "mandatory" contributions of $15,000 each in 1987—were purchases of securities tainted by St. Peter's fraud. To establish a claim under the federal securities laws, plaintiffs must prove fraud "in connection with the purchase or sale of any security." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733–734, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). The district court concluded that these contributions were "a required infusion of capital ... not independent securities purchases."

In response, plaintiffs invoke the "investment decision doctrine" of *Goodman v. Epstein,* 582 F.2d 388, 412–415 (7th Cir. 1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). In *Goodman,* plaintiffs were limited partners with limited liability and no role in the management of the partnership. They contributed a total of $3 million to the partnership under an agreement that "contemplated a number of separate transactions over an extended period of time." 582 F.2d at 391 n. 8. At

issue was whether the statute of limitations began to run on the entire $3 million when the partnership agreement was signed, under the "commitment" doctrine of *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir.1972), or whether each later contribution was a separate security purchase for statute of limitations purposes. Because their limited liability gave the limited partners the practical option of dissolving the partnership instead of meeting the later cash calls, the Seventh Circuit held that they made a new "investment decision," and therefore purchased a new security, when responding to each cash call. The Court analogized the limited partners to holders of assessable stock, who make an investment decision every time they choose to meet the assessment rather than return their stock to the issuer. *See* S.E.C. Rule 136, 17 C.F.R. § 230.136.

Like the district court, we find *Goodman* factually distinguishable. Here, plaintiffs were General Partners, with potentially unlimited liability and substantial voting rights under the Partnership agreement. Their later contributions, assessed under Section 3.2 of the Amended Agreement, reflected the fact that they were personally liable for the Partnership's debts under Minnesota law. Thus, plaintiffs' 1986 and 1987 contributions were like the cash calls in *Stewart v. Germany,* 631 F.Supp. 236 (S.D.Miss.1986), which held that the general partners' later capital contributions did not reflect new "investment decisions" because the partners were liable for the cash calls under the partnership agreement and therefore the contributions were voluntarily made simply to protect their partnership interests from forfeiture. 631 F.Supp. at 246. Here, as in *Stewart,* plaintiffs' later contributions were made pursuant to the Amended Agreement to meet Partnership needs and were intended to protect, not expand, their fully vested ownership inter-

---

**4.** St. Peter in his function as attorney for the Partnership was aware of the securities law implications of the attempt to raise additional equity capital. He advised that, if new investors were to be solicited, a private placement memorandum should be prepared and the Partnership

interests registered. However, when tax law changes left the Partnership with no equity sources other than the existing General Partners, St. Peter acquiesced in the Managing Partners' opinion that registration was not required.

ests. *See also Hill v. Equitable Bank*, 655 F.Supp. 631, 639–640, (D.Del.) *aff'd on other grounds*, 851 F.2d 691 (3d Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).

In sum, plaintiffs were not like holders of assessable stock or the limited partners in *Goodman*, with limited liability, no control over Partnership decisions, and the ability to terminate their exposure by dissolving the partnership at any time. Plaintiffs' potential liability as General Partners was unlimited and unconditional from the beginning.[5] Thus, when Klaers made his "discretionary" $7,500 contribution in 1986, and when both plaintiffs made their mandatory $15,000 contributions in 1987, they were not making new "investment decisions." They were fulfilling their pre-existing obligations as General Partners and attempting to avoid their potential liability should the Partnership fail. *See Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646, 650–652 (9th Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989). Therefore, as the district court correctly concluded, these contributions were infusions of capital to an ongoing enterprise and did not involve "purchases" of securities.

■ Finally, we conclude that the district court did not abuse its discretion in dismissing plaintiffs' pendent and ancillary state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726–727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Gill v. Farm Bur. Life Ins. Co.*, 906 F.2d 1265, 1266 n. 5 (8th Cir.1990). Given the other state court litigation involving this Partnership's affairs, it is particularly appropriate that these pendent claims be pursued in state court following the grant of summary judgment on plaintiffs' federal claims.

Accordingly, we affirm.

---

**5.** Plaintiffs seek to avoid the implications of their unlimited liability under Minnesota partnership law by asserting that one of the Managing Partners had assured them, prior to their signing the Original Agreement, that they would never have to contribute more than their initial

$15,000. Even if the assertion were true and would have given plaintiffs grounds to rescind their purchase, "a decision to rescind is not an investment decision." *Department of Econ. Dev. v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1476 (S.D.N.Y.1988).