620 So.2d 1284 (1993)
Lawrence I. MARCUS, Appellant,
v.
SHAPIRO, ABRAMSON & SCHWIMMER, P.A., and Paul H. Abramson, Appellees.
Nos. 91-1921, 91-2621.
District Court of Appeal of Florida, Fourth District.
May 12, 1993.
Rehearing Denied July 30, 1993.
*1285 Michael R. Casey and Kathleen M. Molchan of Casey and Molchan, P.A., Fort Lauderdale, for appellant.
Gregory A. Martin of Coffey, Aragon, Martin, and Burlington, P.A., Miami, for appellees.
LETTS, Judge.
Involved here is a practicing psychiatrist, persuaded by others who played an active role in the venture, to passively invest in the stock of a proposed savings and loan association. The venture was not a success and the psychiatrist later filed suit against the active participants and the loan association alleging breach of contract and violation of various securities laws. Damages and/or rescission were requested.[1] However, the trial judge granted summary judgment in favor of the active participants and the association, on the basis that the psychiatrist was committed to the purchase of the stock prior to any alleged misconduct and/or after the statute of limitations had run. For the purposes of summary judgment, we disagree with both of these pronouncements and reverse.
In his complaint, the psychiatrist alleged that the active participants and the association had violated section 517.301(1)(a)(2),[2] Florida Statutes (1991), by failing to disclose the material fact that they had entered into "put agreements,"[3] with a third party, before the psychiatrist purchased the securities. It is clear that appellees *1286 omitted to tell the psychiatrist about the put agreements. Their liability for a section 517.301(1)(a)(2) violation, however, turns on whether the omitted fact was material and on whether the omission occurred in connection with the purchase or sale of the securities.
The trial court found that any alleged omission had not occurred "in connection with" the sale of the securities to the psychiatrist and therefore granted summary judgment in favor of the appellees. It did not make any finding on materiality about which we are convinced disputed material issues of fact exist. Specifically, the trial court found:
A sale of securities occurs at the time the purchaser fixes his rights and obligations by executing the investment contract. Brantley v. E.F. Hutton & Co., 710 F. Supp. 135, 140; Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891. With the signing of the subscription agreement Dr. Marcus was committed to buy and Palm Plaza obligated to issue the shares. The sale of the Palm Plaza securities occurred on July 11, 1984.
The notion of the Put Agreements between Shapiro/Abramson and Kahn did not arise until the latter part of 1986. Liability in such cases may be premised only upon misconduct that occurs "in connection with" the purchase or sale of securities. Activities that occur after purchase of a security cannot form the basis for liability. Seattle First National Bank v. Carlstedt, 678 F. Supp. 1543. Thus it is apparent that the alleged misconduct did not occur "in connection with" the sale or purchase of any investment or security. Florida Statute 517.301(a). Defendants are, therefore, entitled to a summary judgment on Count I of the complaint.
(R. 2048-2049).
In holding that the "sale" had occurred in July, 1984, when the psychiatrist executed the stock purchase agreement, the trial court relied upon several cases for the proposition that the purchase or sale of a security occurs on the date that a party enters into a binding commitment to undertake a securities transaction, even though full performance may not occur until a later date. This "commitment test" was set out in Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir.1972), as follows:
Commitment is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.
The psychiatrist argues the July 11, 1984 stock purchase agreement was not a binding commitment because it was revocable. In support of that assertion, he relies upon section 607.051(1) Florida Statutes (1991), the terms of the subscription agreement and subsequent memoranda. All of these factors being present, summary judgment is precluded.
Former section 607.051(1), Florida Statutes (1989), which was repealed, effective July, 1990 (subsequent to the filing of the complaint in this case) and replaced with section 607.0620, is applicable to savings and loans via section 665.047, Florida Statutes (1991). It provides that subscription agreements are irrevocable for a period of six months unless otherwise set forth under the terms of the subscription agreement. New section 607.0620 is in accord stating, "[a] subscription for shares entered into before incorporation is irrevocable for six months unless the subscription agreement provides for a longer or shorter period or all the subscribers agree to revocation."
The agreement in this case is completely silent on the issue of revocability and therefore, according to the psychiatrist, it was revocable after six months. Appellees disagree but do not provide a plausible, alternative interpretation of the statute. They argue that agreements do not necessarily become revocable upon the expiration of the six month period. However, as the psychiatrist points out, no other conclusion is logical. If, under the statute, an agreement *1287 is irrevocable for only six months (unless otherwise provided in the subscription agreement), then it must become revocable at the end of that period. We have not found any case law interpreting the former or current version of this statute. However, the revocability of the July, 1984 stock purchase agreement is demonstrated by other documents as well. In particular, the psychiatrist points to a portion of the June 30, 1986 status letter, (the letter which accompanied the final prospectus) which states in part: "In order to insure that we will have adequate capital to proceed with our planned opening in September, we are requesting that all funds be received by us not later than July 19, 1986. This will give us time to arrange for substitute investors for those individuals who decide, for whatever reason, not to purchase the shares for which they had subscribed." As such, we do not agree the execution of the stock purchase agreement in July, 1984, necessarily concluded the stock sale.
Nonetheless, the appellees argue, even assuming arguendo that the stock purchase agreement became revocable after six months, the alleged omission still could not have occurred "in connection with" the sale because the sale in this case occurred, at the latest, in August, 1986, (two months before the "put agreements") when the psychiatrist sent his 20% down payment and submitted his application for a loan for the balance due. At that time, appellees argue, the psychiatrist was committed in the classic contractual sense, in that there was a meeting of the minds and he obligated himself to perform what he had agreed to perform in July, 1984, even though the balance ($100,000) was not paid until December, 1986.
The appellees may be correct. Even assuming that the 1984 stock purchase contract was revocable, the psychiatrist may well have committed himself to the deal in August, 1986, when he sent his 20% down payment and applied for a loan for the balance, as instructed by the June, 1986 letter which accompanied the final prospectus. Although that finding would render any alleged fraud not "in connection with" the sale, (because the "put agreements" were entered into in October, 1986), federal case law, as explained below, suggests the existence of the "put agreements" was required to be disclosed even if they were entered into after the "sale." Further, it is also possible that the trier of fact would find the sale occurred in December, 1986, (two months after execution of the "put agreements") as the psychiatrist argues, when he paid the $100,000 balance on the purchase price for his shares. If this latter date is found to be the date of the sale, the alleged fraud would be "in connection with the sale." In any event, when the sale occurred is a disputed issue of material fact which precludes summary judgment.
In S.E.C. v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir.1972), the Securities and Exchange Commission brought an action against an issuing corporation and its organizers alleging, among other things, a violation of rule 10b-5 (federal anti-fraud provision). The prospectus in Manor Nursing, stated that unless all 450,000 shares offered were sold by a certain date, the offering would terminate and all funds be returned to the subscribers. The prospectus did not disclose that certain purchasers and participating brokerage firms would be given special treatment as an inducement to participate in the offering.
The organizers subsequently had trouble getting rid of all the shares and rather than return the funds, entered into special agreements with various shareholders. Among these special considerations were repurchase agreements similar to the one in this case. The Second Circuit held the organizers' actions violated the anti-fraud provisions of the federal securities laws because rather than comply with the prospectus and return the funds, they entered into special deals. The court noted the effect of the federal anti-fraud laws is to make sure that "post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors." Id. at 1095. See also A.J. White & Co. v. S.E.C., 556 F.2d 619 (1st Cir.), cert. denied, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977).
Manor Nursing does not require that the defendant know about the fraud at the *1288 time the investor signs the agreement. Rather, the investor must be informed of any action that occurs after signing the contract which materially alters the prospectus. The trial court in this case made no ruling as to whether the "put agreements" were a material alteration of the prospectus. The trial court distinguished Manor Nursing on the ground that the transactions in that case did not resemble the "put agreements." That distinction ignores the principle of Manor Nursing, that investors be told of developments which materially alter the prospectus upon which they based their investment decision.
We note that there is a provision in the final offering circular which makes the 41% ownership, which was imminent in light of the "put agreements," a material alteration. There is a paragraph entitled "Restrictions on Acquisitions of Stock," which states that, according to FSLIC regulations, no company or person may acquire "control" of a FSLIC-insured savings institution at any time without the prior approval of the FSLIC. "Control" is defined as ownership, control or holding of more than 25% of the voting shares. Since the put agreements insured that appellees would, at a time certain, be 41% shareholders, it can be argued that a material alteration of the prospectus occurred. In any event, that is an issue for the trier of fact which preclude summary judgment.
This opinion is in no way intended as a definitive exposition of the law in this area. It is but a reversal of a summary judgment with perceived reasons why such was inappropriate. This is a complicated case to which careful, detailed attention must be given.
In light of our conclusion, we also reverse the award of attorney's fees and costs.
REVERSED AND REMANDED.
GLICKSTEIN, C.J., and WARNER, J., concur.
NOTES
[1] A common law fraud count was abandoned.
[2] Section 517.301, Florida Statutes (1991), states that it is unlawful for a person

(a) in connection with the offer, sale, or purchase of any security, ... directly or indirectly:
1. To employ any device, scheme, or artifice to defraud;
2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.
Section 517.301 creates a "criminal or administrative offense which allows the government to pursue wrongdoers." E.F. Hutton & Co. v. Rousseff, 537 So.2d 978, 981 (Fla. 1989). A private right of action is found in section 517.211 which states:
(2) Any person purchasing or selling a security in violation of section 517.301, and every director, officer, partner or agent of or for the purchaser or seller, if the director, officer, partner or agent has personally participated or aided in making the sale or purchase, shall be jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.
Section 517.211 is similar in effect to federal section 12(2) except that 12(2) protects buyers only from untruthful sales, whereas section 517.211, protects both buyers and sellers. Id. at 981.
[3] In the scenario presented, the "put agreements" entered into took the following form. Apparently, by October of 1986, some 60,000 shares of the required 300,000 had still not been sold. To remedy this, the appellees sold these remaining shares to investors at the same price per share but omitted the 50 cents per share organizational fee which the psychiatrist was required to pay and guaranteed them a profit in that they were to be bought back within six months at $11.50 per share, a boon not offered to the psychiatrist and one which he was not even told about.