THOMAS, Justice.
The respondents were the owners of a one-ninth interest in the outstanding stock of Pensacola Hotel Company, operator of the San Carlos Hotel. On 28 March 1960 they entered into an agreement with Jackson Land Company for the sale to the Company of their interest, aggregating 175 and %5 shares of the capital stock, for $310,-000, payable $50,000 in cash and $3,750 on 15 July 1960 and a like amount on the 15th day of each third month following until the entire balance had been paid. Deferred payments were not to draw interest if made before default and the purchaser was privileged to make advance payments which would be credited to the last maturing installments. There was provision also for discharging the entire remainder at a discount.
Under the contract, the sellers agreed that the stock certificates be re-issued to the purchaser in the form of five certificates of 35 and 14,5 shares each representing, of course, the ninth interest of the respondents. The purchaser, petitioner here, agreed to endorse the five certificates and deposit them with The First Bank and Trust Company of Pensacola or some other person or corporation acceptable to the parties, and upon payment of the entire purchase price the escrow agent was to deliver the certificates to the purchaser. In the interim, unless and until default, the buyer was entitled to vote the stock and collect dividends on it. Payments received by the escrow agent were required to be distributed to the sellers in five equal parts. Subsequently the parties *827 agreed that Southern National Bank of Fort Walton Beach serve as escrow agent instead of the Pensacola bank.
Upon default in any payment for IS days or longer a majority of the sellers could declare the remainder of the purchase price due by written notice to the escrow agent whereupon the agent should notify the purchaser of the notice and the purchaser would have 20 days to discharge the balance of the debt. If the purchaser, in such circumstances, failed to pay the remainder of the price within that period, the escrow agent was to return to each of the sellers one ■of the certificates and the “liability” of the agent then ended. By the agreement a lien was retained on all the shares for unpaid sums. The purchaser was not to receive any share until the purchase price for all had been paid.
The first payment of $50,000 and four installments of $3750 each were made then the purchaser defaulted and the sellers notified the escrow agent of the fact in consequence of which the agent informed the purchaser that unless the balance of the purchase price was paid within 20 days with interest at six per cent, its rights would terminate and the certificates would be returned to the sellers.
Before proceeding it should be recorded, inasmuch as there were five holders of the ninth interest and there are but four respondents, that one of the stockholders meanwhile died and one of the other four stockholders inherited her interest.
In their complaint the respondents detailed the transaction and specifically stated that all the stock of the corporation, including the stock in controversy was that of a closely-held corporation and was owned by the beneficiaries of the late W. B. Harbeson. The significance of these allegations will be clear when we digest the opinion of the District Court of Appeal. The respondents sought a decree commanding the petitioner specifically to perform.
The petitioner moved to dismiss the complaint on the ground that since the respondents had elected to take back the stock and set in motion the procedure to that end, they could not then force the petitioner to perform the contract. The chancellor granted the motion and an appeal was taken by the respondents to the District Court of Appeal, First District, where the order of dismissal was reversed.
The District Court of Appeal observed that the respondents, who were appellants in that court, had presented two questions for determination, namely, entitlement of the respondents to specific performance and whether or not “the contract provision, relative to termination of purchaser’s rights in case of default, [was] an exclusive remedy which would prevent the sellers from obtaining specific performance.” (Italics supplied.)
In dealing with the first point the District Court of Appeal observed that the remedy of specific performance was available to coerce the sale of stock in a closely-held corporation, citing Baruch v. Haggerty, Inc., 137 Fla. 799, 188 So. 797. As we understand the decision in that case, it announced the rule that specific performance would not ordinarily be granted to enforce the transfer of stock unless the stock was of peculiar value, and could not be bought and sold in the market in which case it could not be readily replaced or the value easily ascertained. The court held that because of the need for mutuality of remedy a seller of stock could resort to a court of equity for relief against a prospective buyer who defaulted. This accounts for the allegations of the complaint about the impossibility of determining the value of the stock although it would appear from the very nature of the relationship of the parties and the interest of the respondents themselves in the corporation that the values of the stock in suit was either known to them or easily ascertainable by them.
The District Court of Appeal after alluding to our opinion in Chace v. Johnson, 98 Fla. 118, 123 So. 519, speculated that “had Jackson [Land Company] paid all but a few *828 thousand dollars upon the purchase price and the Harbesons [respondents here] attempted to retake the stock upon such default, it is conclusive that equity would have intervened to have prevented such a forfeiture * * * ” and “had the Harbesons failed to deliver their stock certificates to the escrow agent * * *, then Jackson would have been entitled to specific performance.” These observations are immediately followed by the terse statement that “mutuality of remedy requires a like remedy for either party,” and the pronouncement that the allegations of the complaint “with consideration of the contract as a whole, were sufficient to state a cause of action for equitable relief” therefore it was error for the chancellor to dismiss it.
We understand from the treatment by the District Court of Appeal that the determinative feature of the case in the court’s estimation was the mutuality of remedy available to the parties.
Our difficulty with the ultimate decision of the District Court of Appeal lies in the final statement, in effect, that as failure of the Harbesons to deliver the certificates would have warranted specific performance in behalf of Jackson Land Company and payment of all but “a few thousand dollars” by the latter would have worked intervention of a court of equity, it followed that by the imposition of the rule of mutual remedy the respondents’ complaint withstood the attack upon it.
Neither situation obtained. There was no failure on the part of the Harbesons to deliver the stock. That was accomplished when the contract was signed. And there seems to be no occasion to make an excursion into the law relative to equity-abhorred forfeitures. Actually the petitioner who would benefit by application of the rule does not present the point.
The pleadings and the facts, which are undisputed in the main, are convincing that even if application of the principle of mutuality of remedy was appropriate up to the time that the sellers exercised their option under the contract, it vanished at that time. They now argue that they were but accelerating payment of the balance of the-purchase price. But their action under the terms of the agreement meant much more than that.
Until the default was declared there seems, to have been no breach on the part of either party. The stock certificates had been delivered to the purchaser and by it endorsed in blank and deposited with the escrow agent. By express language of the contract, the buyer had the right to vote the stock and receive dividends. An end came to-these rights when the sellers by their notice caused the escrow agent to notify the buyer of the default.
When the notice by the sellers was given-to the agent, he had no choice but to inform the buyer. This started a new chain of circumstances. The 20-day period of grace-began to run, during which the balance had to be paid. Failure to pay obligated the agent to return all the stock to the sellers- and the unpaid balance began to draw interest though none had been chargeable before. Upon the failure and return of the stock the escrow agent was no longer responsible. It was expressly agreed that “in the event of a default the rights of the Purchaser to each of the shares of stock * * transferred [should] immediately cease and determine.”
The re-delivery of the stock to the sellers and deprivation of the voting right and right to dividends was effectuated by the procedure set in motion by the respondents who now seek a decree forcing the petitioner to take and pay for it.
The court and both parties have paid particular attention to the case of Chace v. Johnson, supra, the petitioner contending that the decision in the instant case conflicts with the holding there, the respondents insisting that there is no inconsistency in the two decisions.
So it appears that we should carefully examine the cited case to ascertain if there is *829 such disharmony, which will give us jurisdiction and if that be the situation, we should go forward with a determination of the merits.
The respondents concede that the case holds that the seller under an escrow agreement has the option of disregarding it and suing for the “matured installments” or retaking the escrow deposit and retaining the consideration received “thereby subjecting himself to a possible claim for relief by the buyer from an inequitable forfeiture.”
Then the respondents commit themselves to the first alternative in two simple sentences : “Here the Harbesons have clearly elected the first course. They have disregarded the escrow and sued for the matured installments.”
We are unable to reconcile these statements with the record. Instead of disregarding the escrow agreement they acted under it by setting in motion the procedure that instrument detailed; instead of suing for the matured installments they are seeking specific performance. We cannot determine from the record where the certificates are but if the escrow agent followed the instructions in the contract, he distributed them to the respondents at the end of the 20-day period and bowed out of the picture. We are somewhat puzzled by the statements in respondents’ brief: “But even if we assume, which is not the case, that the Harbesons are now in physical possession of the stock, their rights under the contract are not precluded. The stock is still registered in Jackson’s name.”
We gather from all this that the respondents operated under the agreement and we feel that they became bound to take the whole loaf.
Now for an analysis of Chace v. Johnson, supra. Two persons entered a contract, one to sell certain land, the other to buy it, for a fixed price, part of which was paid upon execution of the agreement. The remainder of the purchase price was to be paid in periodic installments with interest from date. The purchaser was privileged to pay the installments before maturity. The seller was obligated to execute a deed conveying the property to the buyer and place it in escrow for delivery upon payment of the remainder of the purchase price. The buyer was committed to pay all taxes and liens meanwhile accruing. It was expressly agreed that should the buyer fail for 30 days to meet the deferred payments and interest on them or permit any tax or assessment to become delinquent, the seller should have the right immediately to cancel the contract, retrieve the deed from the escrow agent and retain all payments as liquidated damages. Thereupon the contract should become null and void, any right of the buyer under it should terminate, and should the buyer have caused the contract to be recorded, he promised to execute to the seller a quitclaim deed.
The buyer failed to pay the first installment, due one year after date, and the accumulated interest and the taxes so the seller brought an action to recover all amounts in arrears, including four-fifths of the purchase price. Upon demurrer to the declaration the main question was whether the seller was restricted to the remedy stipulated in the contract or could maintain the action at law. The trial court ruled that he was so restricted and sustained the demurrer. This court commenced its discussion by stating that if the defendants’ position on this point was not sound the demurrer should have been overruled as the declaration was otherwise impervious.
The court referred to the provision of the contract relating to the effect of default on the part of the buyer as “intended for the benefit of the vendor, which he [might] enforce under some conditions or waive at his pleasure.” The court commented that in certain circumstances the exercise of the seller’s right might impel intervention of a court of equity, for instance, if a disproportionate part remained unpaid and enforcement of seller’s right would work an unconscionable sacrifice to the buyer. This principle was developed at least as long ago *830 as the decision in Taylor v. Rawlins, 90 Fla. 621, 106 So. 424.
It is true that there was no acceleration clause in the contract considered in Chace v. Johnson, supra, while there was such a provision in the contract here involved. It should further be noted now that in that case the seller apparently disregarded the contract and sued at law for the sum the buyer originally agreed to pay.
The court concluded in the cited case that the vendor had an option to rescind the contract and recover what damages he actually sustained, presumably up to a conscionable amount, or waive that privilege and bring an action on the unqualified obligation of the purchaser, in which event, again presumably, the seller would be bound upon recovery to deliver a deed to the buyer. The court definitely held that the seller could “waive” his right under the contract and sue for the amount the purchaser promised to pay.
We have stated the two questions posed by appellants in the District Court of Appeal. The second, relative to the exclusiveness of the vendor’s remedy by termination of vendee’s rights under the provision of the contract, seems to have been decided indirectly by the court’s direct conclusion of the first one, namely, that vendee was entitled to specific performance. So the court determined that despite the resort to the remedy imbedded in the contract the vendors could pursue it and have specific performance too.
The respondents in the present case did not pursue such a course. Instead as we have already recounted, they took both avenues because they obviously resorted to the contract and now argue that they disregarded the escrow and sued for the matured installments.
In the Chace case it was said that the seller had an option to rescind and take his damages or waive the privilege and base his action on the agreement of the purchaser to pay. Thus, it seems to us that in the instant case the court sanctioned proceedings under both alternatives.
The position and the conclusion of the District Court of Appeal that mutuality of remedy was pivotal seem to us to have created the confusion which was attempted to be forestalled by the constitutional provision for review by this court of conflicting decisions on the same point of law. In the decisions cited and the one under review we detect sufficient conflict to justify our assumption of jurisdiction.
We decide that the decision of the District Court of Appeal should be quashed so that the order of the chancellor dismissing the complaint will be reinstated.
TERRELL, THORNAL and O’CON-NELL, JJ., concur.
ROBERTS, C. J., dissents and would approve the decision under review.