DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DOUGLAS ANTHONY PERERA**,
Appellant,

v.

**DIOLIFE LLC**, a Florida limited liability company,
Appellee.

No. 4D18-892

[June 12, 2019]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; David A. Haimes, Judge; L.T. Case No. 062016CA006867AXXXCE.

J. David Huskey, Jr. of McGee & Huskey, P.A., Fort Lauderdale, for appellant.

Lida Rodriguez-Taseff and Elan A. Gershoni of DLA Piper LLP (US), Miami, for appellee.

## ON APPELLEE'S MOTION FOR REHEARING EN BANC AND MOTION FOR CERTIFICATION TO THE FLORIDA SUPREME COURT

KUNTZ, J.

Diolife LLC's motion for rehearing en banc or, alternatively, for certification of an issue of great public importance is denied.[1] We sua sponte withdraw our prior opinion and issue this opinion in its place.

---

[1] Perera requests that we sanction Diolife's counsel for "numerous improper statements criticizing this Court" and for filing an improper motion for rehearing. We decline to issue sanctions but, as the Fifth District has done, we stress that "[m]otions for rehearing are not to be used for the purpose of venting counsel's frustrations with the form or substance of the court's decision." *Marion v. Orlando Pain & Med. Rehab.*, 67 So. 3d 264, 265 (Fla. 5th DCA 2011) (citation omitted).

Douglas Perera appeals the circuit court's final judgment. The circuit court entered judgment in Diolife's favor on both Diolife's action for declaratory relief and on Perera's counterclaims for breach of contract and specific performance. The court found the parties orally modified a written contract and, as a result, Diolife did not breach the contract. Alternatively, the court found that if Diolife breached the contract, Perera suffered no damages. Based on the facts and arguments presented, we reverse on both conclusions and remand for entry of judgment for Perera.

## *Background*

### *i. Pre-Lawsuit*

Perera and Diolife entered into a Membership Interest Purchase Agreement ("MIPA"), in which Perera agreed to sell to Diolife a 5% membership interest in Cowboys Saloon Holdings, LLC for $200,000. The parties completed this transaction of the MIPA.

The MIPA also gave Perera the option to sell another 5% interest in Cowboys Saloon Holdings in exchange for another $200,000 from Diolife. The option was exercisable in Perera's sole discretion and required Diolife to tender the purchase price. The MIPA required the sale of the additional interest to close on or before March 31, 2016. This agreement to buy another 5% of Cowboys Saloon Holdings also required Diolife to send written notice to Perera when it was ready to close:

> Agreement to Purchase and Sell the Additional Interest. [Diolife] hereby irrevocably covenants and agrees to purchase from [Perera], and [Perera] shall have the option (exercisable in [his] sole discretion) to transfer, sell and deliver to [Diolife], the Additional Interest in exchange for a total purchase price of Two Hundred Thousand Dollars ($200,000.00) payable in cash at the Second Closing . . . . [Diolife] shall send written notice to [Perera] when it is ready to close on the purchase of the Additional Interest (the "Closing Notice"), and such notice shall be sent no later than March 21, 2016 . . . .

The MIPA specifically provided that it could not be amended orally or through the parties' actions:

> Amendment and Waiver. The provisions of this Agreement may be amended and waived only with the prior written consent of the Seller and the Buyer, and no course of conduct or failure or delay in enforcing the provisions of this

2

Agreement shall be construed as a waiver of such provisions or affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

The parties jointly filed a detailed statement of stipulated facts before trial. They agreed that Diolife did not send the written notice by the March 21, 2016 deadline. Instead, on that day, Diolife's counsel sent Perera's counsel an email stating he understood their clients had "discussed an extension regarding the purchase of an additional 5% membership interest in" Cowboys Saloon Holdings. He suggested "moving the notice and closing date" and attached a draft amended agreement incorporating the proposed new dates.

Two days later, Diolife's counsel again emailed Perera's counsel, stating, "Thanks again for our call yesterday. Can you please provide the discussed offer in writing so my client can have something concrete to review?" Perera's counsel responded, "2.5% for $200,000. Must close by April 15. All other terms of the purchase option remain the same. This is a non-binding offer that only becomes effective upon execution of definitive documents." These terms formed the purported oral modification of the MIPA: Perera's sale of a 2.5% interest for $200,000, with an April 15, 2016 closing date.

Six days later, Perera sent a text message to Diolife's members stating that Cowboys Saloon Holdings was "raising cash from other big funds and ha[d] commitments for higher valuations." The purported commitments at higher valuations was the reason Perera was "pushing" Diolife's members to go through with the purchase before the closing deadline. "Once the deadline passed," however, Perera had to convince other investors to allow Diolife to pay $200,000 but receive only a 2.5% interest because the company's value was increasing. Perera also stated in the text message: "If you guys are not interested[,] I am OK with it but I am doing my best. Let me know your thoughts."

On April 5, 2016, Diolife's counsel again emailed Perera's counsel, stating he "believe[d] [their] clients have agreed on these terms. Please confirm same . . . ." On April 11, 2016, Perera's counsel emailed Diolife's counsel and attached a "First Amendment to Membership Interest Purchase Agreement." Perera signed the attachment, and it reflected the sale of a 2.5% interest for $200,000.

One day later, Diolife's counsel emailed Perera's counsel stating, "Our client has informed us that they do not intend to move forward with the transaction. Thanks."

Seven days after Diolife notified Perera that it would not move forward, Perera sent a demand letter to Diolife and stated in his cover letter that it was his "final attempt to resolve this issue in an attempt to preserve a working business relationship."

## ii. The Lawsuit

Nine days after it notified Perera that it would not be completing its purchase of the additional interest in Cowboys Saloon Holdings, and only two days after Perera sent his demand letter, Diolife brought an action for declaratory judgment to determine whether Perera had a right to claim a breach of the MIPA. Perera filed a counterclaim alleging a breach of contract and seeking specific performance of the contract.

During the lawsuit, Perera remained willing to perform and signed an affidavit stating, "I remain ready, willing and able to convey the 5% Additional Interest to" Diolife. But the circuit court stated in the final judgment that Cowboys Saloon Holdings was formally dissolved and "run into the ground."

The court first entered summary judgment against Perera on his claim for specific performance. Next, after a non-jury trial, the court found for Diolife on its claim for declaratory judgment and on Perera's counterclaim for breach of contract. Perera appeals the court's judgment.

## Analysis

Perera raises three issues on appeal, arguing the court erred by concluding that: (i) the parties entered into an oral modification of the MIPA, (ii) Perera did not suffer any damages even if Diolife breached the MIPA, and (iii) Diolife did not anticipatorily repudiate the MIPA.

We agree with Perera's first two points on appeal and reverse. Because we reverse the judgment, we find it unnecessary to address the third issue on appeal.

## i. Diolife Breached the MIPA

The MIPA required Diolife to purchase another 5% membership interest in Cowboys Saloon Holdings for $200,000 and to close by March 31, 2016. It is undisputed the additional purchase did not happen by the deadline. As a result, Diolife breached the original contract. But Diolife argued, and the circuit court agreed, that the parties orally modified the MIPA before any breach occurred.

4

We first address whether the parties orally modified the MIPA.

When a contract does not address modification, oral modification of the contract is generally permissible. *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 992 (Fla. 4th DCA 2014) (citations omitted). But "[c]ontracting parties are at liberty to address any issue they see fit, including the question of whether their agreement may be modified at all, and, if so, how." *Id.* at 993 (citation omitted).

Here, the MIPA contained a provision barring amendment other than through a writing signed by all parties. When a contract contains such a provision, any alleged oral modification is generally disposed of as a matter of law, and the court should enforce the contract as written. *Id.* But this rule has an exception dating to a 1956 opinion from our supreme court. In *Professional Insurance Corp. v. Cahill*, 90 So. 2d 916 (Fla. 1956), the court explained that even when the contract contains a provision precluding oral modification,

> [a] written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it.

*Id.* at 918 (citation omitted). In *Okeechobee Resorts*, we examined the "judicial choirs' lack of perfect harmony" in applying *Cahill* and the various holdings from the courts. 145 So. 3d at 995. But we concluded that despite the various applications of *Cahill*, *Cahill* remains binding precedent. *Id.* We explained that this requires the plaintiff to prove:

> (a) that the parties agreed upon and accepted the oral modification (i.e., mutual assent); and (b) that both parties (or at least the party seeking to enforce the amendment) performed consistent with the terms of the alleged oral modification (not merely consistent with their obligations under the original contract); and (c) that due to plaintiff's performance under the contract as amended the defendant received and accepted a benefit that it otherwise was not entitled to under the original contract (i.e., independent consideration).

*Id.* (emphases removed).

Applying that test to this case, we conclude that the parties did not modify the MIPA. Diolife argued the parties orally modified the closing deadline and, as a result, it did not breach the contract. And the circuit court agreed, finding the parties agreed—by oral conversations, text messages, and emails—to extend the closing deadline.

But because the MIPA contains a provision precluding oral modification, to establish an oral modification, Diolife needed to establish that the parties acted on the modification and that it would "work a fraud" on Diolife to refuse performance. *See Cahill*, 90 So. 2d at 918. Diolife failed to meet this burden.

At best, Diolife presented evidence that on the day of the deadline, its counsel sent an email about a potential revision to the MIPA. Days later, after other emails, Perera's counsel emailed Diolife's counsel: ". . . All other terms of the purchase option remain the same. This is a non-binding offer that only becomes effective upon execution of definitive documents." Other messages from Perera included requiring Diolife to pay the same $200,000 for only 2.5% of stock instead of the 5% set forth in the MIPA.

But the parties did not act on the communication about potentially amending the MIPA. Most significantly, Diolife never acted on the MIPA or the alleged oral modification because Diolife never sent Perera the required funds. Thus, the *Cahill* requirement that the oral modification must have been "accepted and acted upon by the parties" was not satisfied. *See* 90 So. 2d at 918.

As a result, the parties did not amend the MIPA, and Diolife breached the agreement on March 31, 2016, when it failed to close on the purchase of the additional interest in Cowboys Saloon Holdings.[2]

### ii. *Perera Sustained Damages*

The circuit court found that Perera sustained no damages, a conclusion that would require judgment in Diolife's favor even if Diolife breached the

---

[2] Diolife argues that there were two oral amendments to the MIPA. First, Diolife argues the parties extended the deadline to close on the purchase of the additional stock. Second, Diolife argues the parties modified the stock purchase agreement. But Diolife made no payment to Perera for the additional interest; it did not pay Perera by the original deadline or the allegedly extended deadline. And when the allegedly extended deadline came, Diolife failed to make payment pursuant to the original terms or the allegedly amended terms. Modified or not, Diolife was in breach.

contract. The circuit court determined that because the value of a 5% interest in Cowboys Saloon Holdings exceeded $200,000 on the day of the breach, Perera did not sustain a loss. We disagree.

In arriving at its conclusion, the court reasoned: 1) "the value of a 5% membership interest in Cowboys Saloon was higher than the contract value in the MIPA of $200,000.00, otherwise Mr. Perera would not have been trying to get $200,000.00 for a 2.5% interest"; and 2) there were text messages between the parties and "the agreement that Mr. Perera later entered into, which the Court understands did not go forward . . . ." The court considered the subsequent agreement but refused to consider that the subsequent agreement did not go forward or that Cowboys Saloon Holdings was dissolved. The court stated that it would not consider that "point later in time." But Perera's attempts to obtain better terms in exchange for excusing Diolife's breach is not evidence of the market value of the 5% interest in Cowboys Saloon Holdings. Furthermore, the court relied on text messages that Perera sent after Diolife's deadline to send notice that it was prepared to complete the purchase. Finally, the "agreement later entered into" occurred after the breach. In any event, the court effectively used the out-of-pocket measure of damages to conclude Perera sustained no damages.

But, in a breach of contract action, "[a] non-breaching party is entitled to recover the benefit of its bargain under a contract." *Nat'l Educ. Ctrs., Inc. v. Kirkland*, 635 So. 2d 33, 34 (Fla. 4th DCA 1993). "[T]he goal of damages is to place the injured party in the same position in which it would have been had the breach not occurred." *Tucker v. John Galt Ins. Agency Corp.*, 743 So. 2d 108, 111 (Fla. 4th DCA 1999).

Perera was entitled to the benefit of his bargain. He did not have to search for a potential second investor during the short time between Diolife's correspondence announcing it "did not intend to move forward with the transaction" and the date Diolife filed the lawsuit. In total, only nine days elapsed between Diolife's correspondence withdrawing from the MIPA and the date it filed the lawsuit. Even while the lawsuit was pending, Perera testified by affidavit that he remained "ready, willing, and able" to conclude the transaction as written in the MIPA.

On the date of the breach, March 31, 2016, Perera had a right to receive $200,000 and, instead, he received nothing. *See Shearson Loeb Rhoades, Inc. v. Medlin*, 468 So. 2d 272, 273 (Fla. 4th DCA 1985) (stating that damages generally "should be measured as of the date of the breach" (quoting *Grossman Holdings Ltd. v. Hourihan*, 414 So. 2d 1037, 1040 (Fla. 1982))). His text message bragging about the increased value of the

7

company does not change the fact that he did not receive the benefit of the bargain—$200,000.

Yet Diolife passionately argues in its motion that "the benefit of the bargain measure of damages absolutely requires a plaintiff to prove the actual value of the property at the time of the breach." In support of this assertion, Diolife relies on *Kind v. Gittman*, 889 So. 2d 87, 90 (Fla. 4th DCA 2004). In *Kind*, we stated that "the 'benefit of the bargain' rule [ ] awards as damages the difference between the actual value of the property and its value had the alleged facts regarding it been true." *Id.* (quoting *Martin v. Brown*, 566 So. 2d 890, 891-92 (Fla. 4th DCA 1990)). But *Kind* involved a claim for fraudulent inducement, and this appeal does not.

Still, Diolife is correct that the difference between the contract price and the market value of the interest in the company is one potential measure of damages. *See, e.g.*, *Estate of Callaway v. Garner*, 772 S.E.2d 668, 670 (Ga. 2015); *Miga v. Jensen*, 96 S.W.3d 207, 216 (Tex. 2002); *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559 (N.Y. App. Div. 1982); *Langlois v. Maloney*, 64 A.2d 697, 702 (N.H. 1949). Generally, these cases hold that damages for breach of a stock purchase agreement are measured by comparing the stock's contract price to its market value. *See Aroneck*, 456 N.Y.S.2d at 559.

That is one potential measure of damages. It is not the only one. Diolife incorrectly maintains it would be "unprecedented" to hold that the seller of an interest in a business can receive the contract price. Based on these facts and legal arguments, such a holding is not "unprecedented" or "blatantly wrong."

In fact, "where a buyer breaches his contract to purchase certain specific shares of stock," "[t]he general rule" allows the seller three options. Annotation, *Measure of Damages for Buyer's Breach of Contract to Purchase Shares of Stock*, 44 A.L.R. 358 (1926) (citing *Mason v. Decker*, 72 N.Y. 595, 599 (N.Y. 1878)).

- First, "the seller may treat the stock as belonging to the buyer and recover the contract price . . . ." *Id.*; *see also* 12A Fletcher

8

Cyc. Corp. § 5630 (2018) ("If the seller of stock has delivered it, an action for the price agreed upon may be maintained.").[3]

- Second, the seller may "resell the property as agent of the buyer and recover the difference between the contract price and the net amount received on the resale." Annotation, *Measure of Damages for Buyer's Breach of Contract to Purchase Shares of Stock*, 44 A.L.R. 358 (1926).

- Third, the seller "may keep the shares of stock and recover as his damages the difference between the contract price and the value of the stock at the time when the buyer should have accepted the same." *Id.*

The first available remedy allows a plaintiff to seek the contract price from the defendant, a remedy long ago accepted throughout this country. *See, e.g., Pittsburgh Hardware & Home Supply Co. v. Bown*, 174 F. 981, 983 (3d Cir. 1909); *Veatch v. Howard*, 444 P.2d 865, 867 (Colo. 1968); *Davies v. Semloh Hotel, Inc.*, 44 P.2d 689, 691 (Utah 1935); *Lam v. White*, 264 S.W. 1113, 1115 (Ky. 1924); *Tucker v. Scott*, 186 P. 150, 151 (Cal. 1919).

Similarly, the Pennsylvania Supreme Court explained that the "law in this state as well as elsewhere is that, where the vendor has tendered a delivery of the specific property, for example, stock or bonds, required by the contract, he is entitled to the agreed price." *Vilsack v. Wilson*, 112 A. 17, 19 (Pa. 1920) (citations omitted). And the New York Court of Appeals explained that when a buyer fails to tender the agreed purchase price for stock, "it is too well-settled to be longer disputed that the plaintiff could treat the stock as belonging to the defendant, and sue for and recover the price agreed to be paid for it." *Mason*, 72 N.Y. at 599 (citations omitted).

Like Diolife, a defendant recently argued to Connecticut's intermediate appellate court that "the only proper measure of damages is the difference between the purchase price of the stock and the value of the stock." *Whitney v. J.M. Scott Assocs., Inc.*, 137 A.3d 866, 871 (Conn. App. Ct. 2016). The court rejected the defendant's argument and approved the trial

---

[3] Stock is delivered when an agreement to purchase is signed and the seller has no further obligations. *Jackson Land Co. v. Harbeson*, 153 So. 2d 826, 828 (Fla. 1963) ("There was no failure on the part of the Harbesons to deliver the stock. That was accomplished when the contract was signed."); *see also Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972); *Mason*, 72 N.Y. at 598.

court's imposition of damages in the amount due on the agreement.  *Id.* at 871-72 (awarding damages equal to the total amount due on the agreement minus what the plaintiff had received).

Thus, the remedy awarded to Perera in this case is not "unprecedented."  In fact, it appears the First District allowed the same remedy in *Black v. Frank,* 176 So. 2d 113, 114-15 (Fla. 1st DCA 1965).  There, the seller of stock in a restaurant filed a breach of contract lawsuit against the buyer.  *Id.* at 114.  The trial court awarded damages to the seller "pursuant to the original agreement to purchase the assets."  *Id.* at 115.  On appeal, the buyer argued the trial court erred in awarding damages, as the proper remedy was to return the stock to the seller.  *Id.* The First District disagreed and held that the seller could obtain damages in accordance with the obligations of the contract.  *Id.*

And the Third District allowed the same remedy when a buyer refused to pay for stock she requested a broker acquire.  *Mass v. Gordon,* 101 So. 2d 836, 837-38 (Fla. 3d DCA 1958).  The court explained that "the broker has an election of remedies."  *Id.* at 837.  The broker could "treat the stock as the property of the customer, and sue for the full purchase price upon a tender of the stock; or, he may sell the stock promptly or within a reasonable time, and recover the difference between the purchase price and the amount received on such sale."  *Id.*

The Florida Supreme Court has also recognized that a closely held corporation may be treated differently when dealing with the breach of a contract to purchase stock.  The court held that "[t]he rule enunciated by this Court . . . appears to be in accord with the weight of American authority in holding that contracts for the sale of stocks that have no recognized market value, or which are not readily procurable except from the defendant will be specifically enforced."  *McCutcheon v. Nat'l Acceptance Corp.,* 197 So. 475, 478 (Fla. 1940) (citation omitted); *see also Jackson Land Co.,* 153 So. 2d at 828; *Baruch v. W. B. Haggerty, Inc.,* 188 So. 797, 799 (Fla. 1939); *Chace v. Johnson,* 123 So. 519, 521 (Fla. 1929).

Similarly, we have explained that

> [i]n *Baruch* . . . the [Florida Supreme Court] held that where the corporation was a closed one, and where none of the stock had ever been put on the market and had no readily ascertainable market value and where the stock had no fixed value and no par value, the buyer would be entitled to invoke the aid of equity to enforce a contract for sale of stock.

> Further, the court found the doctrine of mutuality of remedy
> would entitle the seller to specific performance[.]

*Camp v. Parks*, 314 So. 2d 611, 613–14 (Fla. 4th DCA 1975).[4]  The fact that Cowboys Saloon Holdings was an entity without stock on a public market is a factor to be considered.

Perera was entitled "to pursue any remedy which the law affords." *Black*, 176 So. 2d at 115.  In *Black*, the First District held the seller of stock had a right to pursue the remaining contract amount from the buyer. *Id.*  So too does Perera.  While the generally accepted remedy may be (and should be) the difference between the agreed purchase price and the market value of the stock, that is not a viable remedy in this case.  On these unique facts and based on the issues raised, Perera is entitled to the $200,000 stated on the face of the MIPA.

### *Conclusion*

Diolife breached the MIPA when it did not close on the purchase of the additional 5% interest, and there was no valid oral modification.  As a result, Perera sustained damages in the amount of $200,000.  We therefore reverse the court's judgment and remand for entry of judgment consistent with this opinion.

*Reversed and remanded.*

GERBER, C.J., and TAYLOR J., concur.

*       *       *

***FINAL UPON RELEASE; NO MOTION FOR REHEARING WILL BE ENTERTAINED; MANDATE ISSUED SIMULTANEOUSLY WITH OPINION.***

---

[4] Perera did not appeal the court's judgment on his claim for specific performance, perhaps because performance is now impossible, though it was possible when Diolife filed the lawsuit.

11